IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| OLLIE GODWIN, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CASE NO:  2:05-cv-00783-SRW |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | From Circuit Court of Crenshaw Co. |
| COMPANY OF PITTSBURGH, INC., | ) | Case No:  CV05-69 |
| ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

## MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant National Union Fire Insurance Company of Pittsburgh, PA (hereinafter "NUFIC")[1], and hereby moves this Honorable Court to enter, pursuant to Rules 54 and 56 of the Federal Rules of Civil Procedure, a final summary judgment in its favor, dismissing all claims made by the Plaintiff against NUFIC on the grounds that there are no genuine issues of material fact and NUFIC is entitled to a final summary judgment as a matter of law.

### STATEMENT OF UNDISPUTED FACTS

1.    The Plaintiff, Mr. Ollie Godwin (hereinafter "Mr. Godwin"), leases three trucks to Godwin Material Services, Inc. (hereinafter "Godwin Material").  (Godwin Depo. p.49:5-7, Exhibit 1).

---

[1] The plaintiff incorrectly named the defendant in its complaint as "AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc."  The entities issuing policies relative to this suit were AIG Life Insurance Company (not "AIG") and National Union Fire Insurance Company of Pittsburgh, PA.  Thus, "AIG" had no role in the events made the basis of his suit and is not a proper party in this suit.  Further, service was not perfected or even attempted on "AIG" as the plaintiff merely served this defendant, NUFIC, via registered agent pursuant to Ala. Code ' 10-2B-15.10 and ALA. R. CIV. P. 4(c)(6). There was no service on "AIG".  Without service, the lower court from which this case was removed never obtained personal jurisdiction over "AIG".  Ala. R. Civ. P. 4.2. Thus, no judgment should be entered against "AIG".  For the purposes of this Motion, NUFIC responds for both AIG Life and NUFIC.

2.    Mr. Godwin also drives one of the trucks he leases to Godwin Material.  (Exhibit 1, p.49:8-10)  He contracts with other drivers to drive his other two trucks for Godwin Material.  Currently those drivers are Mark Morgan and Clyde Williamson. (Exhibit 1, pp.49:11-23 and 50:1-9).

3.    Godwin Material requires its leased drivers to maintain occupational accident insurance through a group policy obtained by Godwin Material.  (Exhibit 1, p.36:1-20)  Mr. Godwin became an insured on Godwin Material's policy in 1999.  (Pine Affidavit, p.1, Exhibit 2)

4.    In addition to occupational accident insurance, Mr. Godwin obtained Blue Cross Blue Shield health insurance through Godwin Material.  (Exhibit 1, pp.43:16-23 and 44:1-14)

5.    The premiums for Mr. Godwin's occupational accident insurance and health insurance were deducted from his monthly check from Godwin Material.  (Exhibit 1, p.48:12-21)

6.    Godwin Material purchased its occupational accident insurance through Palomar Insurance Corporation (hereinafter "Palomar"), an insurance broker.  (Exhibit 2, p.1)

### 2003 Injury Claim

7.    As of May 1, 2003, Godwin Material's group occupational accident insurance was issued by AIG Life Insurance Company (hereinafter "AIG Life").  (Exhibit 2, pp.1-2)

8.    On or about October 25, 2003, Mr. Godwin claims to have fallen on the tarp rack on his truck.  (Exhibit 1, pp.65:17-23 and 66:1-8)

9.      Godwin Material requested drivers call in when they were injured.  (Exhibit 1, p.73:12-16)  Mr. Godwin called Ms. Cindy Jordan at Godwin Material to tell her he fell on the tarp rack; however, he did not fill out a claim for this incident, and he did not ask Cindy to make a claim for him.  (Exhibit 1, p.69:6-22)

10.     Mr. Godwin did not see a doctor after he fell on the tarp rack.  (Exhibit 1, p.70:11-13)  He also did not report this accident to AIG Life.  (Exhibit 1, p.69:17-19)

11.     On or about November 22, 2003, around 11:00 a.m., a muffler fell on Mr. Godwin while he was repairing a busted exhaust pipe on one of the trucks he owned but allowed another driver to operate.  (Exhibit 1, pp.73:22-23; 74:1-6; 76:20-23; 77:10-23 and 78:1-9)

12.     Mr. Godwin was working on the truck at his home at the time of the accident, and he had not made any deliveries for Godwin Material that day.  (Exhibit 1, pp.76:17-19 and 77:1-3)

13.     The next day, Mr. Godwin called Ms. Jordan at Godwin Material to tell her he had been injured when the muffler fell on him.  (Exhibit 1, pp.86:1-10)

14.     On December 9, 2003, AIG Life received a call reporting a stomach injury to Mr. Godwin which occurred on November 22, 2003.  (Exhibit 2, p.2)

15.     AIG Life received a Policyholder Loss Information Report completed by Ms. Jordan on December 10, 2003, regarding Mr. Godwin's injury which was forwarded through Palomar to AIG Life.  (Exhibit 2, p.2)  The Policyholder Loss Information Report noted Mr. Godwin was not under dispatch at the time of the accident, and he was scheduled to be at home.  (Exhibit A of Exhibit 2)

16.     On January 8, 2004, Mr. Godwin signed a Proof of Loss form received by AIG

Life.  The form asked the following question:

GIVE FULL DESCRIPTION OF INJURY OR DISEASE FROM WHICH YOU ARE NOW SUFFERING.  IF AN INJURY, TELL WHEN IT HAPPENED (DATE AND TIME), PLACE WHERE ACCIDENT OCCURRED, WHAT YOU WERE DOING AND HOW IT HAPPENED

Mr. Godwin's answer was:

On November 22, 2003 around 11:00 A.M. at home in shop working on truck, changing the muffler dropped it, hit me in lower stomach.

(Exhibit B of Exhibit 2)

17.    Additionally, the "No" box was filled in after the question: "Have you ever had this, or a similar condition, in the past?"  (Exhibit B of Exhibit 2)

18.    Mr. Godwin alleges in his Complaint that "[o]n or about October/November 2003, the Plaintiff suffered an occupational injury that resulted in the Plaintiff having surgery for hernia."  (Complaint ¶11)

19.    AIG Life informed Mr. Godwin through a letter dated February 27, 2004, that, under the terms of the Policy and according to the information received by AIG Life, the accident was considered non-occupational because Mr. Godwin was "not under dispatch nor was [his] truck loaded at the time of the accident."  Thus, the benefit maximum was $7500.00 and that amount was paid to L.V. Stabler Hospital. (Exhibit 2, p. 2 and Exhibit C of Exhibit 2)

20.    After receiving the February 27, 2004 letter from AIG Life, Mr. Godwin alleges he spoke to Mr. Hank Strother[2] of Palomar regarding the fact the truck he was working on was loaded and under dispatch at the time of the accident.  (Exhibit 1, p.95:6-22)

21.    As far as Mr. Godwin can recall, Mr. Strother is the only person, besides Ms. Jordan and Mr. Jerry Godwin of Godwin Material, he spoke with about the truck

_____

[2] Mr. Strother was incorrectly referred to as Mr. Strott throughout the deposition of Mr. Godwin.

being loaded and under dispatch.  (Exhibit 1, p.100:2-11)

22.    On March 17, 2004, Mr. Jerry Godwin of Godwin Material sent a letter to Palomar mentioning Mr. Godwin had hit his stomach in October 2003 while under dispatch. (Exhibit E of Exhibit 2)

23.    The letter also noted Mr. Godwin "was maintaining the truck at the direction of Godwin for DOT purposes."  (Exhibit E of Exhibit 2)

24.    On July 1, 2004, Palomar sent two letters to Mr. Godwin regarding the alleged October 2003 injury.  (Defendant Palomar Insurance Corporation's Response to Plaintiff's First Request for Interrogatories and First Request for Production, Exhibit 3)  The letters requested Mr. Godwin to fill out claims forms regarding the alleged October 2003 injury and enclosed forms for him to complete.  (Exhibit 3, pp.10 & 14)

25.    On February 23, 2005, Mr. Godwin submitted another claim form regarding his 2003 loss.  (Exhibit 2, p.3 and Exhibit E of Exhibit 2)  This claim form again describes the November 2003 injury, but mentions nothing about an October 2003 injury.  Additionally, the "No" box was again filled in after the question: "Have you ever had this, or a similar condition, in the past?"  (Exhibit E of Exhibit 2)

26.    Mr. Godwin did not pay any medical bills relating to his hernia claim; he believes Blue Cross Blue Shield paid the remainder of the medical bills related to his hernia. (Exhibit 1, p.104:6-13).

27.    Mr. Godwin was out of work from December 22, 2003 through February 3, 2004 because of his hernia injury.  (Exhibit 1, p.115:1-9)

**<u>2004 Injury Claim</u>**

28.    In May 2004, Godwin Material's occupational accident insurance was issued through NUFIC.  (Exhibit 2, p.3)

29.    On October 27, 2004 at approximately 11:00 a.m., while hauling concrete to The Concrete Company, Mr. Godwin twisted his knee while getting out of his truck. (Exhibit 1, pp.115:10-23; 116:1-15; and 121:8-16)

30.    Mr. Godwin did not call anyone at Godwin Material on October 27, 2004 about his twisted knee.  (Exhibit 1, p.120:4-10)  He did later report his twisted knee to Ms. Jordan.  (Exhibit 1, pp.122:18-23 and 123:1-4)

31.    A few days after he twisted his knee, Mr. Godwin went to see Dr. Adams.  (Exhibit 1, p.122:4-17)  Dr. Adams referred Mr. Godwin to Dr. Barrington after determining he could not help Mr. Godwin.  After examination, Dr. Barrington advised Mr. Godwin he would need total hip replacement for his left hip.  (Exhibit 1, pp.123:10-23 and 124:1-17)

32.    On December 7, 2004, NUFIC received a phone call reporting the injury incurred by Mr. Godwin on October 27, 2004.  (Exhibit 2, p.3)

33.    On January 6, 2005, and then again on January 10, 2005, NUFIC received from Palomar a Proof of Loss signed by Mr. Godwin on December 8, 2004, a Claim Form signed by Dr. Barrington on January 3, 2005, a Policyholder Loss Information Report signed by Ms. Cindy Jordan on December 8, 2004, and information regarding Mr. Godwin's earnings.  (Exhibit 2, p.3 and Exhibit F and G of Exhibit 2)

34.    On January 25, 2005, Ms. Stephanie Pine, NUFIC's claims examiner, sent a fax to Dr. Barrington requesting information regarding Mr. Godwin's claim for benefits. This fax requested the following information:

Is the claimant's disability due to injuries he sustained on 10/27/2004?  If no, please explain in detail.
Is the claimant's disability due to a congenital and/or degenerative disease? If yes, please explain?
Please submit medical records and office notes for the period 1/1/2004 to present.

(Exhibit 2, p.3 and Exhibit H of Exhibit 2)

35.    Dr. Barrington's office responded to Ms. Pine's fax with notes and medical records indicating osteonecrosis of both femoral heads.  (Exhibit 2, p.4 and Exhibit I of Exhibit 2)

36.    Ms. Pine also spoke with Dr. Barrington.  (Exhibit 2, p.4)

37.    On or about February 10, 2005, Mr. Godwin underwent hip replacement surgery. (Exhibit 1, p.124:18-21)

38.    On February 19, 2005, Ms. Pine sent a letter to Mr. Godwin informing him he did not qualify for Temporary Total Disability and Accident Medical Expense benefits because, after corresponding with and talking to Dr. Barrington, his loss did not qualify as an Occupational Injury.  (Exhibit 2, p.4 and Exhibit J of Exhibit 2)

39.    Dr. Barrington sent a letter to Ms. Pine on March 2, 2005, explaining he treated Mr. Godwin for avascular necrosis with collapse of the left hip.  Dr. Barrington noted Mr. Godwin had increased pain in his left side since he stepped out of his truck in November, and it probably resulted from a previously unknown underlying condition, which was the avascular necrosis.  (Exhibit K of Exhibit 2)

40.    After receiving Dr. Barrington's letter, Ms. Pine sent Mr. Godwin's claim to Dr. Lafleche for review.  (Exhibit 2, p.4)

41.    Ms. Pine learned from Dr. Lafleche that Mr. Godwin's hip problems did not result solely from the knee injury but also from the previously unknown condition of

avsacular necrosis.  (Exhibit 2, p.4)

42.  Thereafter, on May 3, 2005, Ms. Pine sent another letter to Mr. Godwin further explaining the reasons that Mr. Godwin's October 27, 2004 loss did not qualify for coverage.  (Exhibit 2, p.4 and Exhibit L of Exhibit 2)

43.  On May 12, 2005, Ms. Arlene Richardson, counsel for Mr. Godwin, sent a letter to Ms. Pine demanding reconsideration of his claims of 2003 and 2004.  (Exhibit M of Exhibit 2)

44.  Then, on July 12, 2005, Mr. Godwin filed this present suit in Crenshaw County, Alabama, against Palomar Insurance Corporation, AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc. and Godwin Material Services, Inc.

45.  NUFIC removed the suit to the United States District Court for the Middle District of Alabama, Northern Division on the basis of diversity jurisdiction because Godwin Material and Palomar were fraudulently joined defendants.

46.  This Court denied Mr. Godwin's Motion to Remand, and this litigation has proceeded in this Court.

47.  In response to discovery propounded by NUFIC, Mr. Godwin claims, among other things, that he "should have received disability payments of $500.00 per week for six months under the insurance policy while [he] was injured and recovering."  (No. 3, Plaintiff Answers to Interrogatories and Request for Production Propounded by Defendant, Exhibit 4, pp.1-2)

48.  During the course of this litigation, NUFIC retained the services of Dr. Daniel Michael to review the medical records and diagnostic studies of Mr. Godwin and render opinions as needed.  (Dr. Michael Affidavit, Exhibit 5)

49.     After review of Mr. Godwin's medical records, x-rays and MRIs, Dr. Michael concluded that the MRIs taken in early November 2004 after Dr. Godwin twisted his knee revealed no collapse of the left femoral head.  Because avascular necrosis was already apparent in both hips at that time and given the time it takes avascular necrosis to develop, Dr. Michael concluded there was no relationship between Mr. Godwin's accident in October 2004 and the onset and subsequent problems Mr. Godwin has in both hips from the avascular necrosis of the femoral heads.  (Exhibit 5, pp.1-2)

50.     After his left hip replacement, Mr. Godwin underwent an experimental procedure on his right hip and, later, hip replacement surgery on his right hip; he is not claiming any cost associated with those procedures as damages because, Mr. Godwin alleges, Dr. Barrington told him his Blue Cross Blue Shield insurance should cover those procedures.  (Exhibit 1, pp.129:15-23; 130:1-23; 131:1-13; 137:20-23; and 138:1-4)

51.     Although some payments were made by NUFIC with regard to his October 27, 2004 loss claim, these payments were made in error; NUFIC's position has always been and remains to be that the October 27, 2004 loss claim does not qualify for coverage.  (Exhibit 2, p.5-6)

**Applicable Policy Provisions**

52.     The AIG Life Truckers Occupational Accident Insurance Policy in effect in 2003 states, in pertinent part, as follows:

SECTION I        GENERAL DEFINITIONS

* * *

**Dispatch** means the period of time during which an Insured operates his or her vehicle, or performs vehicle repair, while being en route to pick up a load, picking up a load, en route to deliver a load, and unloading a load.

\* \* \*

**Injury** means bodily injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which *results directly from and independently of all other causes* in a Covered Loss.  All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

\* \* \*

**Occupational** means, with respect to an activity, accident, incident, circumstance or condition involving an insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the course of the Insured performing services within the course and scope of contractual obligations for the Policyholder, *while under Dispatch*.  Occupational does not encompass any period of time during the course of everyday travel to and from work.

\* \* \*

SECTION VII    CLAIMS PROVISIONS

**Notice of Claim.**  Written notice of claim must be given to the Company within 20 days after an Insured Person's loss, or as soon thereafter as reasonably possible.  Notice given by or on behalf of the claimant to the Company at American International Companies, Accident and Health Claims Division, P.O. Box 15701, Wilmington, DE 19850-5701, with information sufficient to identify the Insured Person, is deemed notice to the Company.

\* \* \*

**Proof of Loss.**  Written proof of loss must be furnished to the company within 90 days after the date of the loss.  If the loss is one for which the Policy requires continuing eligibility for periodic benefit payment, subsequent written proofs of eligibility must be furnished at such intervals as the Company may reasonably require.  Failure to furnish proof within the time required neither invalidates nor reduces any claims if it was not reasonably possible to give proof within such time, provided such proof if furnished as soon as reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required.

* * *

**NON-OCCUPATIONAL COVERAGE RIDER**

This Rider is attached to and made part of the Policy as of the Policy Effective Date shown in the Policy's Master Application.  It applies only with respect to accidents that occur on or after that date.  It is subject to all of the provisions, limitations and exclusions of the Policy except as they are specifically modified by this Rider.

**Non-Occupational Coverage.**  References in the Policy to an injury or accident, where applicable, are hereby deemed to include Non-Occupational Injury and Non-Occupational accident, respectively.

Benefits shall be payable for only those Covered Losses listed in the Schedule under Non-Occupational Accident Benefits, and shall be subject to the Non-Occupational Accident Benefit limitations shown therein.

**Non-Occupational** – as used in this Rider, means, with respect to an activity, accident, incident, circumstance or condition involving an Insured Person, that it does not occur or arise out of or in the course of the Insured Person performing Occupational services for the Policyholder, while under Dispatch.

**Non-Occupational Injury** – as used in this Rider, means, bodily injury caused by a Non-Occupational accident occurring while this Policy is in force as to the person whose injury is the basis of claim and resulting directly and independently of all other causes in a Covered Loss.

All injuries sustained by an Insured Person in any one accident shall be considered a single Injury.

* * *

A. Occupational Accident Benefits:

    CLASS 1 & 2

* * *

    (5)  <u>X</u>  Temporary Total Disability Benefit
                Commencement Period (Initial Disability)…….90 days
                Waiting Period…………………………….…7 days
                Participation Percentage…………………………..70%
                Maximum Weekly Benefit Amount………………$500

Maximum Benefit Period………………..104 weeks

* * *

A. Non-Occupational Accident Benefits:

CLASS 1 & 2

(1)  X_  Accidental Death Benefit
Principal Sum………………………………$10,000
Incurral Period………………………………365 days
Deductible Amount…………………………………$0

(2)  X_  Accidental Dismemberment Benefit
Principal Sum………………………………....$10,000
Incurral Period………………………………365 days
Deductible Amount…………………………………$0

(3)  X_  Accident Medical Expense Benefit (Primary)
Commencement Period………………………90 days
Deductible Amount…………………………………$0
Maximum Benefit Period…………………104 weeks
Dental Maximum………………..$1,000 per accident
Maximum Benefit Amount………………......$7,500

(Exhibit N, pp. 3, 4, 16, & 24 of Exhibit 2) (emphasis added)

53.    The NUFIC Truckers Occupational Accident Insurance Policy in effect in 2004

states, in pertinent part, as follows:

**SECTION 1**                    **GENERAL DEFINITIONS**

* * *

**Covered Loss(es)** means one or more of the losses or expenses described in
Section IV of this Policy.

* * *

**Injury** means bodily Injury to an Insured Person caused by an
Occupational accident while coverage is in force under this Policy, which
***results directly and independently of all other causes in a Covered Loss***.
All Injuries sustained by an Insured Person in any one accident shall be
considered a single Injury.

* * *

**Pre-Existing Condition** means a condition for which an Insured Person has sought or received medical advice or treatment during the twelve months immediately preceding his or her effective date of coverage under this Policy.

* * *

**SECTION VI**                                      **EXCLUSIONS**

This Policy does **not** cover any losses caused in whole or in part by, or resulting in whole or in part from the following:

* * *

2. *sickness, disease* or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning;

* * *

(Exhibit O, p.3, 4, & 15 of Exhibit 2)

### STANDARD OF REVIEW

In order to succeed on a motion for summary judgment, the movant must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  See FED. R. CIV. P. 56(c).  The movant may meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-324 (1986).  Further:

> [i]f the movant succeeds in demonstrating the absence of a material issue of fact, the burden shifts to the non-movant to establish, with evidence beyond the pleadings, that a genuine issue material to the non-movant's case exists.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993); see also FED. R. CIV. P. 56(e) ("When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of [his] pleading, but [his] response ... must set forth specific facts showing that there is a genuine issue for trial.").  What is material is determined by the substantive law applicable to the case.  Anderson v. Liberty Lobby Inc., 477

13

U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A dispute of material fact "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Rather, the non-movant must present "affirmative evidence" of material factual conflicts to defeat a properly supported motion for summary judgment. Anderson, 477 U.S. at 257. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. See Holifield v. Reno, 115 F.3d 1555, 1564 n. 6 (11th Cir. 1997); Harris v. Ostrout, 65 F.3d 912 (11th Cir. 1995).

Home Ins. Co. v. Hartford Fire Ins. Co., 379 F. Supp. 2d 1282, 1285-1286 (M.D. Ala. 2005)

## ARGUMENT

I.    **MR. GODWIN'S BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW.**

Mr. Godwin alleges NUFIC breached its contract with him by failing and refusing to perform its part of the Policy. (Complaint ¶35). However, Mr. Godwin's claim of breach of contract fails as to each of his alleged occupational injuries because he did not fulfill the conditions precedent to the coverage he claims he is due. In order to prove a breach of contract, Mr. Godwin must establish the following: 1) the existence of a valid contract binding the parties in the action, 2) his own performance under the contract; 3) AIG Life or NUFIC's non-performance; and 4) damages. See State Farm Fire and Cas. Co. v. Slade, 747 So. 2d 293, 303 (Ala. 1999) quoting Southern Medical Health Systems, Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala. 1995).

### A. 2003 Injury Does Not Qualify as Occupational Injury because Mr. Godwin was Not Under Dispatch

The maximum Non-Occupational Accident Medical Expense Benefit, $7500.00, was paid on Mr. Godwin's behalf by AIG Life for his hernia resulting from his November 2003 loss. Mr. Godwin alleges, however, that his claim is due to be paid as an Occupational Injury

and, by not doing so, the insurance contract was breached.  Because Mr. Godwin's loss does not qualify as an Occupational Injury because he was ***not*** "under Dispatch," he cannot establish the second element of his breach of contract claim and, therefore, AIG Life is entitled to judgment as a matter of law.  Id.

The Policy specifically outlines, and the February 27, 2004 letter from AIG Life to Mr. Godwin confirms, that in order to receive benefits for an Occupational Injury, an Insured must be "under Dispatch."  The Policy defines "Dispatch" as "the period of time during which an Insured operates his or her vehicle, or performs vehicle repair, while being en route to pick up a load, picking up a load, en route to deliver a load, and unloading a load."  (Exhibit N)  It is undisputed that Mr. Godwin ***not*** under Dispatch at the time the muffler fell on him and he injured himself.  Mr. Godwin stated he was at home at the time of the accident and had not made any deliveries that day.  Although Mr. Godwin claims the truck he was repairing was loaded, this truck was driven, not by Mr. Godwin, but by one of Mr. Godwin's drivers.  That driver, not Mr. Godwin, was under Dispatch.  Mr. Godwin was not "en route to pick up a load, picking up a load, en route to deliver a load, [or] unloading a load."  Because Mr. Godwin's injury failed to meet the definition of "Occupational" because he was not "under Dispatch," he is not entitled to an Occupational benefit; he cannot prove his own performance under the Policy which would qualify him for Occupational benefits, and his breach of contract claim for his 2003 injury fails as a matter of law.

Mr. Jerry Godwin of Godwin Material attempted to relate Mr. Godwin's hernia to an unreported accident occurring in October 2003.  However, this information does not change the benefit to which Mr. Godwin is entitled.  In order to qualify as an Injury for which benefits will be paid, the injury must arise out of one accident.  As defined in the Policy, Injury "means

bodily injury to an Insured Person caused by an Occupational[3] accident while coverage is in force under this Policy, ***which results directly from and independently of all other causes*** in a Covered Loss. All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury." In order to fit the definition of Injury in the Policy, the alleged October accident and the November accident cannot combine to cause the Injury. Simply stated, Mr. Godwin's 2003 loss does not fit the definition of Occupational because he was not "under Dispatch." Alabama law states "ambiguities will not be inserted, by strained and twisted reasoning, into contracts where no such ambiguities exist." Madison Co. Sheriff's Posse, Inc. v. Horseman's United Assoc., Inc., 434 So. 2d 1387, 1389 (Ala. 1983). Thus "Occupational" and "Dispatch" cannot be twisted to encompass Mr. Godwin's situation.

Also, Mr. Godwin never reported the October accident to AIG Life. On the Proof of Loss form signed by Mr. Godwin on January 8, 2004, in response to the question, "Give full description of injury or disease from which you are now suffering. If an injury, tell when it happened (date and time), place where accident occurred, what you were doing and how it happened," Mr. Godwin replied: "On November 22, 2003, around 11:00 A.M. at home in shop working on truck, changing the muffler dropped it, hit me in lower stomach." Mr. Godwin also marked the "no" box after the question, "Have you ever had this, or a similar condition in the past?" In order to recover under the Policy, written notice of a claim must be provided within 20 days and written proof of loss must be furnished to the company within 90 days after the date of the loss. No notice or proof of loss was ever received from Mr. Godwin regarding the October 2003 incident. Furthermore, after he was provided additional forms to complete regarding the October 2003 claim in response to Godwin Material's letter, Mr. Godwin

---

[3] The definition of Injury is modified by the Non-Occupational Coverage Rider to include Non-Occupational Injuries and accidents for which limited benefits are provided. (Exhibit N)

completed the form mentioning still only the November 2003 incident and again marking the "no" box in response to the question, "Have you ever had this, or a similar condition, in the past?"

In Alabama, "the requirements of an insurance policy that the insured shall give notice and furnish proofs of loss within a certain time are conditions precedent to the right to sue." American Fire and Casualty Co. v. Burchfield, 285 Ala. 358, 363, 232 So. 2d 606, 610 (Ala. 1970) citing Vardaman v. Benefit Ass'n of Railway Employees, 263 Ala. 236, 240, 82 So. 2d 272, 275 (Ala. 1955) quoting 29 AM. JUR. Insurance §1105, p. 829. Such failure entitles AIG Life to judgment as a matter of law. See Nationwide Ins. Co. v. Nilsen, 745 So. 2d 264 (Ala. 1998) (insured's failure to comply with condition precedent entitled insurer to judgment as a matter of law). Thus, AIG Life is not in breach of its contract, and Mr. Godwin cannot maintain his suit as he failed to meet the condition precedent of written notice of the October 2003 injury. Additionally, Mr. Godwin's November 2003 injury was Non-Occupational. Thus, he cannot recover for the 2003 alleged injuries.

### B. 2004 Incident Does Not Qualify as Injury

Mr. Godwin is not entitled to benefits for his October 2004 claim because Mr. Godwin's avascular necrosis of the hip does not fulfill the definition of Injury. "Injury" is defined in the Policy as "bodily Injury to an Insured Person caused by an Occupational accident while coverage is in force under this Policy, which results directly and independently of all other causes in a Covered Loss. All Injuries sustained by an Insured Person in any one accident shall be considered a single Injury." Because Mr. Godwin's hip replacement was necessitated by avascular necrosis, it neither resulted "directly" from the October 2004 incident, nor "independently of all other causes."

The disability claim form completed by Dr. Barrington on January 7, 2005 indicated avascular necrosis of both hips.  Ms. Pine's correspondence with Dr. Barrington confirms Mr. Godwin suffered from osteonecrosis of both hips.  (Exhibit K, p.2)  Furthermore, when Ms. Pine spoke to Dr. Barrington directly, he confirmed the avascular necrosis was a previously unknown underlying condition that was aggravated by work.  As such, Mr. Godwin's injury does not qualify as an "Injury" under the Policy because it did ***not*** result "directly and independently of all other causes."

Additionally, as pointed out by Ms. Pine in her February 19, 2005 letter to Mr. Godwin, the Policy also specifically excludes from coverage "any losses caused in whole or in part by, or resulting in whole or in part from the following: … 2. ***sickness, disease*** or infections of any kind, except bacterial infections due to an accidental cut or wound, botulism or ptomaine poisoning; …." (emphasis added)  This exclusion also precludes Mr. Godwin from receiving coverage for his October 2004 injury.  Dr. Michael confirms avascular necrosis is a disease.

The Middle District of Alabama recently had the opportunity to decide a factually similar case.  Black-Gammons v. Zurich America Ins. Co., No. 1:04cv819-MHT (WO), 2006 U.S. Dist. LEXIS 1942 (M.D. Ala. Jan. 2, 2006).  In Black-Gammons, the plaintiff was an independent contractor truck driver leased to U.S. Xpress.  Id. at *3.  While exiting her cab one day, she slipped and fell.  Id.  Thereafter, she filed a claim for benefits under a group occupational accident insurance policy issued by the defendant to U.S. Xpress.  Id. at *4.  Much like the Policy at issue in this case, the benefits Black-Gammons sought applied only to injuries defined as "an accidental bodily injury that is caused solely by accidental means and is independent of all other causes."  Id.  The policy also provided benefits only when a disability "resulted solely and directly" from an injury sustained while performing occupational duties, as

opposed to disability resulting from sickness, disease, or repetitive or cumulative traumas.  Id.

> Granting the defendant insurer's motion for summary judgment, the court held
>
> It is not disputed that the insurance policy at issue in this case does not cover illness or disease, as opposed to injuries resulting "solely and directly" from an accident.  It is also not disputed that doctors have diagnosed Black-Gammons with non-injury-related illnesses.  Zurich America has presented evidence that it terminated Black-Gammons's policy because doctors reported that her disability is the result of degenerative disc disease, independent of her work-related injury.  Such disease would disqualify Black-Gammons for benefits under the explicit terms of the policy.
> …
> Black-Gammons has presented no medial evidence whatsoever that the herniated discs which form the only basis of her claim are solely and directly related to her accident, as opposed to stemming from the degenerative-disc disease with which she has been diagnosed.
> …
> In sum, Zurich America has produced evidence that Black-Gammons is ineligible for benefits under the clear terms of the insurance policy, and Black-Gammons has failed entirely to come forward with any argument, much less any specific facts, showing that summary judgment should not be granted on her breach of contract claim.

Id. *9-12.  Likewise, in this case, the Policy provides that any loss caused in part by sickness, disease or infection is excluded and that an Injury must result from an Occupational accident, directly and independently of all other causes.  Also, the medical evidence as reported to NUFIC by Dr. Barrington noted Mr. Godwin suffered from a previously underlying condition, avascular necrosis.  NUFIC's expert Dr. Michael noted the early November 2004 x-rays and MRIs revealed avascular necrosis was present in the left hip, but there was no collapse of the femoral head.  He found "no relationship between the alleged October 2004 accident and the onset and subsequent problems Mr. Godwin had in both hips from the avascular necrosis of the femoral heads."  On the other hand, Mr. Godwin has not provided any medical evidence that his need for hip surgery resulted directly and independently of all other causes.  Thus, NUFIC, like the defendant insurer in Black-Gammons, is entitled to summary judgment for Mr.

Godwin's breach of contract claim.  See also Westbrook v. Safeco Life Ins. Co., 908 F.2d 927 (11th Cir. 1990).

## II.    MR. GODWIN'S BAD FAITH CLAIM FAILS AS A MATTER OF LAW.

In order to maintain a bad faith claim, Mr. Godwin must show 1) an insurance contract between the parties and a breach thereof by AIG Life or NUFIC; 2) an intentional refusal to pay Mr. Godwin's claim; 3) the absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason); 4) AIG Life or NUFIC's actual knowledge of the absence of any legitimate or arguable reason; 5) if the intentional failure to determine the existence of a lawful basis is relied upon, Mr. Godwin must prove AIG Life or NUFIC's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.  See State Farm Fire and Cas. Co. v. Slade, 747 So. 2d 293, 304 (Ala. 1999) quoting Nat'l Sec. Fire and Cas. Co. v. Bowen, 417 So. 2d 179, 183 (Ala. 1982).  Requirements 1) through 4) represent the "normal" case; requirement 5) represents the "abnormal" case.  Slade, 747 So. 2d at 306.

First, any claims for bad faith must fail because there was no breach of the insurance contract by AIG Life or NUFIC.  See infra Part I.  In a "normal" bad faith case, "in order for a plaintiff to make out a prima facie case of bad faith refusal to pay an insurance claim, the proof offered must show that the plaintiff is entitled to a directed verdict on the contract claim and, thus, entitled to recover on the contract claim as a matter of law."  Nat'l Savings Life Ins. Co. v. Dutton, 419 So. 2d 1357, 1362 (Ala. 1982).  But, breach of contract is a requisite element of "abnormal" bad faith claims as well.  Slade, 747 So. 2d at 318.  Because Mr. Godwin's breach of contract claim must fail, so must both his "normal" and "abnormal" bad faith claims.

Second, Mr. Godwin cannot prove the absence of any reasonably legitimate or arguable

reason for AIG Life's determination that his loss constituted a Non-Occupational Injury.

> An "arguable reason" means "'open to dispute or question,' and '[w]hen a claim is fairly debatable the insurer is entitled to debate it, whether the debate concerns a matter of fact or law.'" Simmons v. Congress Life Ins. Co. and Insurers Admin. Corp., 2000 WL 1137368, *6 (Ala. 2000) (bad-faith refusal to pay, or to investigate, certain health-insurance claims) (quoting National Security Fire & Casualty Co. v. Bowen, 417 So. 2d 179, 183 (Ala. 1982)).

West Beach Dev. Co. v. Royal Indem. Co., No. Civ.A. 99-0782-P-S, 2000 WL 1367994, n.10 (S.D. Ala. Sept. 19, 2000). Mr. Godwin's 2003 injury qualified as a Non-Occupational Injury and AIG Life paid benefits as such. Mr. Godwin's 2004 claim did not qualify as an Injury under the Policy, and thus he was not eligible for benefits. Because AIG Life and NUFIC abided by the terms of their respective Policies, they had completely legitimate reasons for their actions. Thus, Mr. Godwin's bad faith claim fails as a matter of law.

Third, Mr. Godwin's "abnormal", or failure-to-investigate, bad faith claim must fail because Mr. Godwin cannot prove that further investigation of his claim by AIG Life or NUFIC would have resulted in coverage. In order to prove a bad-faith-failure-to-investigate claim, Mr. Godwin must prove that a proper investigation would have revealed that his loss was covered under the terms of the contract. Slade, 747 So. 2d at 318.

With regard to Mr. Godwin's 2003 claim, no further investigation by AIG Life would have changed the fact that his injury was properly determined to be Non-Occupational because he was not "under Dispatch" when he injured himself in November. The letter sent by Godwin Material does not refute this fact. Even if he was under Dispatch in October 2003 when he allegedly injured himself with the tarp rack, he would still not qualify for additional benefits. As discussed infra in Part I, the October and November 2003 incidents cannot combine to cause an Injury. And, as Mr. Godwin stated at his deposition, he was at home and had made no

deliveries on the day of his accident.  He was not "under Dispatch."  No further investigation would change this information.  As the Middle District has previously held, "If a lawful basis for denial exists, 'the insurer, as a matter of law, cannot be held liable in an action based upon the tort of bad faith.'"  Alberson v. Nationwide Assur. Co., No. 03-T-011-S, 2003 U.S. Dist. LEXIS 24963 (M.D. Ala. Oct. 24, 2003), *13.  Additionally, AIG Life's efforts to obtain more information from Mr. Godwin were thwarted when he filled out a second Proof of Loss with the exact same information he had already provided about the November 2003 incident and no mention of the October 2003 incident.  Thus, Mr. Godwin's "abnormal" bad faith claim for his 2003 claim must fail.

With regard to Mr. Godwin's 2004 claim, an "abnormal" bad faith claim cannot be maintained because, again, no further investigation would have resulted in coverage.  Slade, 747 So. 2d at 318.  NUFIC investigated Mr. Godwin's claim by contacting Dr. Barrington.  Dr. Barrington confirmed the 2004 injury was probably merely an aggravation of the previously unknown underlying avascular necrosis.  Further, NUFIC had Dr. Lafleche review Mr. Godwin's records, and he also determined, because of the avascular necrosis, Mr. Godwin's 2004 loss did not qualify as an Injury.  Indeed, Dr. Michael has concluded the avascular necrosis and its resulting problems are unrelated to Mr. Godwin twisting his knee.  Not only did NUFIC thoroughly investigate Mr. Godwin's claim, but the investigation led to the same initial conclusion – Mr. Godwin's 2004 loss does not qualify as an Injury.  Therefore, Mr. Godwin's "abnormal" bad faith claim for his 2004 loss must also fail.

## CONCLUSION

Both AIG Life and NUFIC are entitled to judgment as a matter of law because Mr. Godwin cannot prove breach of contract for either his 2003 or 2004 injuries.  Mr. Godwin

received the benefit to which he was entitled for his November 2003 Non-Occupational Injury. Mr. Godwin's 2003 injury does not qualify him for Occupational benefits because he was not under Dispatch. Further he failed to provide notice for his alleged October 2003, and such notice is a condition precedent of the right to sue. Also, Mr. Godwin's 2004 loss does not qualify as an Injury under the Policy, and thus his breach of contract claim against NUFIC must fail as well.

Since Mr. Godwin cannot maintain a breach of contract claim, his bad faith claim fails as a matter of law. Additionally, since Mr. Godwin cannot prove any further investigation into any of his claims would have resulted in a difference in coverage, his abnormal bad faith claim fails as well. Because there is no dispute as to any material fact and NUFIC is entitled to judgment as a matter of law as to each of Mr. Godwin's claims, this Motion for Summary Judgment is due to be granted.

Respectfully submitted,

/s/ Michelle L. Crunk
John W. Dodson            (DOD012)
Michelle L .Crunk          (CRU017)
*Attorneys for AIG d/b/a National Union Fire Insurance Company of Pittsburgh, Inc*

OF COUNSEL:
**FERGUSON, FROST & DODSON, LLP**
2500 Acton Road, Suite 200
Birmingham, Alabama 35243

## **CERTIFICATE OF SERVICE**

This is to certify that on this the 6th day of October, a copy of the forgoing document has been served upon counsel for all parties to this proceeding via EMC/CF e-filing:

Arlene M. Richardson
RICHARDSON LEGAL CENTER, LLC
Post Office Box 971
Hayneville, Alabama  36040-0971

/s/ Michelle L. Crunk_____
OF COUNSEL

137228