## Page 1

IN THE UNITED STATES DISTRICT COURT,
FOR THE NORTHERN DISTRICT OF ALABAMA,
NORTHERN DIVISION

CIVIL ACTION NO. CV-205-cv-00783-SRW

OLLIE GODWIN,
    Plaintiff,
vs.
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, INC., et al.,
    Defendants.

DEPOSITION
of
OLLIE GODWIN
JULY 10, 2006

TAKEN BEFORE: Donald R. Eaton
    Registered Professional
    Reporter and Notary Public

## Page 2

STIPULATION

IT IS STIPULATED AND AGREED, by and between the parties, through their respective counsel, that the deposition of OLLIE GODWIN may be taken before Donald R. Eaton, Registered Professional Reporter and Notary Public, State at Large;

That the signature to and reading of the deposition by the witness is waived, the deposition to have the same force and effect as if full compliance had been had with all laws and rules of Court relating to the taking of depositions;

That it shall not be necessary for any objections to be made by counsel to any questions, except as to form or leading questions, and that counsel for the parties may make objections and assign grounds at the time of trial, or at the time said deposition is offered in evidence, or prior thereto.

## Page 3

APPEARANCES

FOR THE PLAINTIFF:
Ms. Arlene M. Richardson
Attorney at Law
133 Hayneville Plaza
Post Office Box 971
Hayneville, Alabama 36040-0971

FOR THE DEFENDANT,
Ms. Michelle L. Crunk
Attorney at Law
Ferguson, Frost & Dodson
2500 Acton Road, Suite 200
P.O. Box 430189
Birmingham, Alabama 35223

## Page 4

INDEX
    PAGE:
EXAMINATION BY MS. CRUNK.......... 6
EXAMINATION BY MS. RICHARDSON... 150
REEXAMINATION BY MS. CRUNK...... 172

DEFENDANT'S EXHIBITS:
Defendant's Exhibit 1........... 64
Defendant's Exhibit 2........... 87
Defendant's Exhibit 3........... 94
Defendant's Exhibits 4A and 4B.. 120
Defendant's Exhibits 5A and 5B.. 125
Defendant's Exhibits 6A, 6B & 6C 135

PLAINTIFF'S EXHIBITS:
Plaintiff's Exhibits 1 and 1A... 150
Plaintiff's Exhibits 2A, 2B & 2C 153
Plaintiff's Exhibit 3........... 154
Plaintiff's Exhibit 4........... 155
Plaintiff's Exhibit 5........... 157
Plaintiff's Exhibit 6........... 159
Plaintiff's Exhibit 7........... 161
Plaintiff's Exhibit 8........... 162

Page 33

1   A.   They sent forms and filled
2   them out and mailed them back in.
3   Q.   Who sent forms?
4   A.   I believe it was AIG, the
5   insurance company.
6   Q.   Who did you report your
7   accident to at work?
8   A.   I didn't report it to nobody.
9   They knowed about it. Jerry Godwin, he
10  knew it. I didn't know nothing for a
11  couple of days.
12  Q.   Did you contact AIG personally
13  to receive the forms to fill out?
14  A.   My wife did it for me.
15  Q.   Did you get a form from work
16  that you filled out as a result of this
17  accident, from Godwin Material?
18  A.   I don't know. My wife took
19  care of all that because my hand was
20  broke. It was in a cast. I couldn't
21  write. Busted one of my eardrums, you
22  know, and she took care of all of that.
23  Q.   You stated earlier that Godwin

Page 34

1   Material had AIG insurance for the lease
2   drivers around 1991 or '92 for the first
3   time; is that correct?
4   A.   I think so.
5   Q.   And your wreck occurred in
6   '92; is that correct?
7   A.   '92, '93, right in there.
8   Q.   When you first enrolled for
9   this occupational accident policy in 1991
10  or 1992, did you receive any materials
11  regarding the policy?
12  A.   No. All I received was just a
13  little old card, you know, an insurance
14  card.
15  Q.   Who gave you the insurance
16  card?
17  A.   Office did, Godwin Material.
18  Q.   How did you become enrolled in
19  the policy?
20  A.   The company set it all up. We
21  went down there and filled out the
22  papers.
23  Q.   Where did you go to fill out

Page 35

1   the papers?
2   A.   Brantley.
3   Q.   Is Brantley where Godwin
4   Material's office is located?
5   A.   Yes.
6   Q.   What papers did you have to
7   sign to become enrolled?
8   A.   Well, you just put your age,
9   you know, Social Security number, stuff
10  like that, who you wanted to be the
11  beneficiary if you died or something, got
12  killed in the truck.
13  Q.   Did you read the paper that
14  you signed and filled out to become
15  enrolled?
16  A.   Yes.
17  Q.   Do you remember what that
18  paper said?
19  A.   That was a long time back.
20  Q.   Did anyone explain the policy
21  to you when you became enrolled at Godwin
22  Material?
23  A.   No.

Page 36

1   Q.   How did you know about this
2   insurance coverage that was to be made
3   available to you through Godwin Material?
4   A.   Well, through them. They told
5   us, you know, we had to have it.
6   Q.   Who told you?
7   A.   Jerry Godwin. We either had
8   to have occupational insurance or they
9   wasn't going to let us -- you couldn't
10  load your trucks.
11  Q.   Did Jerry Godwin talk to you
12  about this one-on-one?
13  A.   No. Just, you know, like at a
14  safety meeting talked about it.
15  Q.   So at a safety meeting Jerry
16  Godwin explained to you and other lease
17  drivers that you had to have this
18  insurance policy or you couldn't load
19  your truck; is that correct?
20  A.   That's correct.
21  Q.   Did he say anything else about
22  the policy?
23  A.   No. He just told us, you

OLLIE GODWIN
NATIONAL UNION FIRE INSURANCE COMPANY

OLLIE GODWIN
July 10, 2006

Page 41

1  policy that you currently have through
2  Pinkard Agency, is that a policy that you
3  took out individually?
4      A.   Yes.
5      Q.   Did you have to provide proof
6  of occupational accident insurance to
7  Jerry Godwin or Godwin Material to begin
8  driving with them again?
9      A.   Yes.
10     Q.   Other than the wreck that you
11 were in in 1992, have you ever made any
12 other claim under an occupational
13 accident policy other than the hernia or
14 hip claim we're here to discuss today?
15     A.   No.
16     Q.   Did you have a copy of your
17 accident policy when your wreck occurred
18 in 1992?
19     A.   Didn't have a policy or
20 anything.
21     Q.   What information regarding
22 your policy did you have in 1992 when the
23 wreck occurred?

Page 42

1      A.   None. We had to call them and
2  get them to send the forms.
3      Q.   Did you request a copy of the
4  policy at that time?
5      A.   No, I didn't.
6      Q.   Have you ever asked anyone at
7  Godwin Material for a copy of your AIG
8  occupational accident policy?
9      A.   Yes.
10     Q.   When?
11     A.   When I hurt my hip.
12     Q.   Who did you ask for a copy of
13 your policy?
14     A.   Cindy.
15     Q.   What did Cindy tell you?
16     A.   She gave me one.
17     Q.   When Cindy gave you a copy of
18 the policy, was this before or after you
19 had obtained a copy of the policy from
20 your brother-in-law?
21     A.   It was after.
22     Q.   Who was your brother-in-law
23 that gave you a copy of the policy?

Page 43

1      A.   Eddie Faulk.
2      Q.   Do you know how Eddie Faulk
3  got a copy of the policy?
4      A.   No, not really. I reckon he
5  had back surgery and all.
6      Q.   When you asked Cindy for a
7  copy of the policy and she gave it to
8  you, did she have it there in the office?
9      A.   Yes.
10     Q.   Had you ever asked her or
11 anyone else at Godwin, previous to the
12 occasion where you received a copy of the
13 policy from Cindy Jordan, for a copy of
14 the policy?
15     A.   No.
16     Q.   Besides occupational accident
17 insurance, do you receive any other
18 insurance through your lease relationship
19 with Godwin Material?
20     A.   Blue Cross Blue Shield.
21     Q.   How long have you had Blue
22 Cross Blue Shield through Godwin
23 Material?

Page 44

1      A.   Probably six years.
2      Q.   Previous to having Blue Cross
3  Blue Shield health insurance through
4  Godwin Material, did you have health
5  insurance?
6      A.   Yes. With my wife through her
7  work at Russell Corporation.
8      Q.   Who was your health insurance
9  company through your wife at Russell?
10     A.   Blue Cross Blue Shield.
11     Q.   Do you currently have Blue
12 Cross Blue Shield health insurance
13 through Godwin Material?
14     A.   Yes.
15     Q.   Since you began having Blue
16 Cross Blue Shield health insurance
17 through Godwin Material approximately six
18 years ago, has there ever been a lapse in
19 your health insurance coverage?
20     A.   No.
21     Q.   Have you ever had health
22 insurance through any company other than
23 Blue Cross Blue Shield?

Page 45

1   A.   No.
2   Q.   Have you ever made a claim
3   underneath your Blue Cross Blue Shield
4   health insurance policy through Godwin
5   Material?
6   A.   Yes.
7   Q.   Would you tell me about those
8   claims?
9   A.   Well, my hernia. I filed it
10  on my hips. And when I had a pin put in
11  my hip, I had filed it on it.
12  Q.   Any other claims you've made
13  under Blue Cross Blue Shield besides the
14  hernia, hip and pin in hip?
15  A.   No. When I had the wreck.
16  And I don't know which one of them paid
17  it, but I never heard one thing about it.
18  Then I had the -- I had hip replacement.
19  Then they put a pin in my right hip. I
20  filed it then because that pin didn't
21  work. It was an experimental thing.
22  They were just starting trying it. So it
23  collapsed. And, so, I had another hip

Page 46

1   put in.
2   Q.   So you had two hip
3   replacements?
4   A.   Yes.
5   Q.   Did Blue Cross Blue Shield pay
6   for any claims you made related to your
7   hernia injury?
8   A.   Yes.
9   Q.   Regarding your first hip
10  replacement, did Blue Cross Blue Shield
11  pay any and all claims you made regarding
12  that hip replacement?
13  A.   Yes. They paid some, and then
14  AIG paid a few. And then everybody now
15  is wanting their money back. They're
16  thinking AIG should pay it all. That's
17  what I mean, it's just a big mess.
18  Q.   Blue Cross Blue Shield and AIG
19  paid on your first hip replacement; is
20  that correct?
21  A.   Yeah, paid some. Blue Cross
22  paid. Then they asked for their money
23  back from several of the doctors.

Page 47

1   Q.   Do you know what doctors Blue
2   Cross Blue Shield has requested their
3   money back from?
4   A.   From Dr. Adams and from, I
5   think, the anesthesiologist, then from
6   the X-ray place where I went and had some
7   X-rays done. I don't know who else.
8   She's got letters on it all.
9   Q.   What is your fee arrangement
10  through your lease with Godwin Material?
11  A.   My what?
12  Q.   How do you get paid through
13  Godwin?
14  A.   Well, you get paid once a
15  month. And it's on whatever you haul.
16  They get ten percent.
17  Q.   And you get 90 percent; is
18  that correct?
19  A.   Yeah.
20  Q.   What expenses are deducted
21  from your fee arrangement with Godwin
22  Material?
23  A.   Nothing. Just the ten

Page 48

1   percent, you know. Like if you run
2   $10,000, they get a thousand dollars.
3   But we can buy -- then they take our
4   liability insurance out and what fuel we
5   burn and parts we buy. They take that
6   out.
7   Q.   Who is your liability
8   insurance through, what company?
9   A.   I'm not sure. I would have to
10  check. It's through Palomar. I know
11  they write it, but they change them up.
12  Q.   So, liability insurance, fuel
13  and parts are taken out of your check
14  from Godwin. Are your premiums for your
15  occupational accident policy also taken
16  out of your check?
17  A.   Well, it was, but it's not now
18  on mine. Yes.
19  Q.   What about your health
20  insurance?
21  A.   Yes, it's taken out.
22  Q.   Is your lease with Godwin
23  Material in your name?

Page 49

1   A.   Yes.
2   Q.   Has it always been in your
3   name?
4   A.   That's right.
5   Q.   How many trucks do you lease
6   with Godwin Material?
7   A.   Three.
8   Q.   And you drive one of those
9   trucks, I presume, correct?
10  A.   Yeah, when I'm able.
11  Q.   Who drives the other two?
12  A.   Mark Morgan and Clyde
13  Williamson.
14  Q.   Do Clyde Williamson and Mark
15  Morgan have their own leases with Godwin?
16  A.   No. They have their own,
17  their own everything except for the
18  accident policy. I pay it.
19  Q.   You pay the premiums for Mark
20  Morgan and Clyde Williamson's
21  occupational accident policy?
22  A.   Yes.
23  Q.   Are Mark Morgan and Clyde

Page 50

1   Williamson salaried employees of you?
2   A.   Yeah. You know, like contract
3   drivers, they get a percentage of the
4   truck.
5   Q.   So you have a contract with
6   Mark Morgan and you have a contract with
7   Clyde Williamson separate from your
8   arrangement with Godwin Material?
9   A.   Yes.
10  Q.   Have you held any second jobs
11  since you've been working with Godwin
12  Material?
13  A.   No.
14  Q.   Now, I'm not asking you for
15  exact figures, but over the last five
16  years could you give me an average yearly
17  earning for your trucks that you leased
18  with Godwin Material?
19  A.   It varies. I mean, do you
20  want the gross?
21  Q.   That's fine.
22  A.   I would say average around
23  375, 375,000.

Page 51

1   Q.   For each truck?
2   A.   No, for all of them. Some
3   years they do better. It's just
4   according to how the work is, you know.
5   Q.   What kind of income tax
6   statement do you receive from Godwin
7   Material?
8   A.   We just get a statement, you
9   know, of the money, what we run, parts
10  and fuel and everything taken out of it.
11  Q.   Do you file taxes as a
12  self-employed person?
13  A.   Yeah.
14  Q.   Do you file taxes jointly with
15  your wife?
16  A.   Yes.
17  Q.   Have you always filed taxes
18  jointly with your wife?
19  A.   Yes.
20  Q.   Do you have any life insurance
21  policies currently?
22  A.   Yes.
23  Q.   Through what insurance

Page 52

1   companies do you have life insurance?
2   A.   Probably three different ones.
3   It's Ronnie Paulk Agency. He's the one
4   that writes them up and all.
5   Q.   Paulk?
6   A.   Yeah. He's in Greenville.
7   Q.   How long have you had your
8   life insurance policies?
9   A.   Probably 20 years.
10  Q.   Have you obtained any life
11  insurance over the past five years?
12  A.   Yes.
13  Q.   Do you know what insurance
14  company that policy would be through?
15  A.   No.
16  Q.   Did you have to take a medical
17  examination to obtain that life
18  insurance?
19  A.   Yeah. Well, you had to take a
20  blood test, stuff like that.
21  Q.   Which doctor conducted the
22  examination that was necessary to obtain
23  that policy?

Page 65

1    A.   Just a little old card you
2  signed each year. Might have been a
3  paper, I guess. All you did was put your
4  name and stuff on it, then your spouse,
5  you know, stuff like that.
6    Q.   But the sheet that you filled
7  out may have had information similar to
8  this on it?
9    A.   No, it don't have that.
10 That's the first time I ever saw that
11 (indicating).
12   Q.   Okay. Now, I would like to
13 talk about your hernia claim. Could you
14 tell me the date that you were injured?
15   A.   October 22nd when I fell on a
16 tarp rack.
17   Q.   Describe to me what happened
18 on October 22nd, 2003.
19   A.   Well, I rolled my tarp back up
20 to the front of the trailer, and I
21 strapped it down. Climbing over -- I had
22 my steps in the front of the trailer, and
23 I was climbing over the rail. And the

Page 66

1  tarp bracket's got -- you know, you set
2  your tarp in front of the trailer on some
3  of them. This one here, I climbed over
4  the steps, and it was a little damp. And
5  I slipped, and it hit me in the side, the
6  tarp bracket did. And I told Cindy about
7  it. And then, you know, it was giving me
8  a little problem, but it wasn't bad.
9         Then I think it was on the
10 25th of November or something I was
11 putting a muffler on the truck. And I
12 had to pick it up by the pipe. And when
13 I did, the top of it was loose. And it
14 got overbalanced with me and pushed me
15 back. And I fell, and the muffler hit me
16 right where I hurt myself with the tarp
17 rack. And I reported that.
18   Q.   Let's go back to October 22nd,
19 2003 when you were pulling the tarp and
20 the tarp rack hit you. Why were you
21 pulling the tarp? Were you pulling the
22 tarp over a load?
23   A.   I had just dumped the load

Page 67

1  out. You've got to push it back up
2  before you can put another load in it.
3    Q.   Where had you dumped the load
4  previous to rolling up the tarp?
5    A.   I'm not sure. That settlement
6  there will show it. Look on the 22nd.
7         MS. RICHARDSON: He also
8  brought with him today his settlement
9  sheets that have those dates on them.
10 And I've made you a copy.
11        MS. CRUNK: Okay. Thanks.
12        MS. RICHARDSON: Off the
13 record.
14        (Off-the-record discussion.)
15   A.   That's the last day I worked
16 before I had the surgery. That's when I
17 went back to work. On the 25th is when I
18 fell on the tarp rack. I was hauling
19 sand to -- I think to a concrete company.
20   Q.   (BY MS. CRUNK:) On October
21 25th, 2003 is when you pulled the tarp
22 rack on yourself; is that correct? What
23 day of the week was that?

Page 68

1    A.   I'm not sure.
2         MS. RICHARDSON: Do you want
3  me to get a calendar?
4    A.   It seemed like it was on a
5  Thursday, though.
6         MS. RICHARDSON: Let's let him
7  look at a calendar before he answers that
8  question.
9         MS. CRUNK: Okay.
10        MS. RICHARDSON: If you don't
11 mind, he can testify to his memory.
12        MS. CRUNK: That's fine.
13   Q.   (BY MS. CRUNK:) If you don't
14 remember the day of the week it is,
15 that's fine. My next question is, it
16 shows that you had a load on October
17 25th, 2003, which is when you were
18 injured by the tarp rack, correct? And
19 then again on October 27th, 2003, you
20 were driving; is that correct?
21   A.   Yeah.
22   Q.   Did you miss a day of work on
23 October 26th, 2003?

17 (Pages 65 to 68)

Page 69

1    A.   I don't remember. I hurt
2  myself then, but I kept working, you
3  know. And then when the muffler fell on
4  me, that's when I had to have something
5  done about it.
6    Q.   You stated earlier that after
7  the tarp rack hit you, you told somebody
8  at Godwin Material about that?
9    A.   Yes.
10   Q.   Cindy Jordan; is that correct?
11   A.   Yes.
12   Q.   What did you tell Cindy?
13   A.   I told her I fell on the tarp
14 rack and hurt my stomach. It swolled up
15 and it bruised, so I told her, you know,
16 in case anything come up about it.
17   Q.   Did you fill out a claim for
18 that injury?
19   A.   No.
20   Q.   Did you request Cindy to fill
21 out a claim for you?
22   A.   No. I just -- they always
23 tell us to call when something happens so

Page 70

1  they'll have it on record.
2    Q.   Did you call Cindy to let her
3  know that you had been injured or did you
4  speak to her in person?
5    A.   I called her.
6    Q.   What did she say to you in
7  response?
8    A.   She just said, okay, she'd
9  make a note of it, put it on file, you
10 know.
11   Q.   Did you go see a doctor after
12 your injury on October 25th?
13   A.   No, not right then.
14   Q.   Do you know if you did miss
15 any work on October 26th or not?
16   A.   I'm not sure.
17   Q.   Okay. Looking at the sheets
18 that your attorney just gave me, I'm
19 missing the month of November, 2003.
20        MS. CRUNK: Do you have those
21 sheets?
22        MS. RICHARDSON: No.
23        MS. CRUNK: I have October

Page 71

1  2003, and then the next sheet starts on
2  December 12th, 2003.
3         MS. RICHARDSON: Let's see.
4  Maybe we just didn't copy it. Were you
5  out of work? No. We don't have those.
6         MS. CRUNK: Okay.
7    Q.   (BY MS. CRUNK:) These sheets
8  that I have in front of me, these
9  commission reports, are these documents
10 that you maintain or did you get these
11 from Godwin Material?
12   A.   No. We maintain them.
13   Q.   So would you have in your
14 possession the records for the month of
15 November 2003?
16   A.   Yes.
17   Q.   And we could get those?
18   A.   These are what comes in with
19 your settlement each month so you'll know
20 exactly how many loads you hauled.
21   Q.   Okay.
22   A.   Yeah, she'd have that.
23   Q.   Okay. So, on October 25th,

Page 72

1  you were injured with the tarp rack, and
2  called in Cindy and told her that you
3  were hurt, but you did not file a claim
4  at that time; is that correct?
5    A.   That's correct.
6    Q.   And then what happened in --
7  let's go back. On October 25th, you had
8  just unloaded a load; is that correct?
9    A.   That's correct.
10   Q.   Did you go pick up a load
11 after you hurt yourself?
12   A.   Yeah.
13   Q.   That same day; is that
14 correct?
15   A.   No, not that day. The next
16 day I did.
17   Q.   So -- I'm sorry to interrupt
18 you. The load that you had just unloaded
19 on October 25th before you injured
20 yourself was your last load for that day?
21   A.   That's correct.
22   Q.   And as far as you know, you
23 went the next day?

Page 73

1   A.   I worked the next day.
2   Q.   Worked the next day. Okay.
3   A.   The papers show it. I'm not
4   one just to run to the doctor just every
5   little bump.
6   Q.   After you were hit with the
7   tarp rack, did you go immediately home?
8   A.   Yeah.
9   Q.   Did you call Cindy from your
10  house?
11  A.   Yes.
12  Q.   You stated that Godwin
13  Material requested that you call in every
14  time you had an injury; is that correct?
15  A.   Anything that something might
16  occur from it later on, yeah.
17  Q.   Prior to being hit with a tarp
18  rack on October 25th, 2003, had you ever
19  called any other injury in to Godwin
20  Material?
21  A.   Not that I can remember.
22  Q.   You stated earlier that on
23  November 25th, 2003 you hit yourself with

Page 74

1   a muffler; is that correct?
2   A.   Yeah, with a muffler.
3   Q.   What time of day did this
4   occur?
5   A.   I think it was around about
6   11:00.
7   Q.   What time of day was it when
8   you were hit with the tarp rack in that
9   paper?
10  A.   Probably around 4:30 or 5:00.
11  Q.   Do you typically finish work
12  daily around 4:30 or 5:00?
13  A.   Well, I did then because if
14  you notice, all the tickets is that
15  concrete company, TCC. That's just --
16  that's when they was building the Hyundai
17  plant. I was hauling sand from one side
18  of Montgomery, from the north side to the
19  south side. So most of it all run out
20  about the same time.
21  Q.   It looks like during the month
22  of December 2003 and also over here in
23  February 2004 that TCC is also the same

Page 75

1   company that you're driving for. Is this
2   also in relation to building the Hyundai
3   plant?
4   A.   Yeah.
5   Q.   So for how long did you do
6   that?
7   A.   About seven or eight months.
8   It was a long time. Some days we'd fill
9   them up and go somewhere else, but I was
10  their primary hauler for them.
11  Q.   When you were delivering sand
12  from north of Montgomery to south of
13  Montgomery for TCC, what time in the
14  morning would you start?
15  A.   Most of the time it'd be about
16  7:00.
17  Q.   So am I correct in
18  understanding that from about 7:00 to
19  about 5:00 in the evening you would just
20  make continuous runs hauling sand from
21  north of Montgomery to south of
22  Montgomery? Is that correct?
23  A.   Yeah.

Page 76

1   Q.   Okay. Tell me what happened
2   the day that you were hit with a muffler.
3   A.   On a big truck, you got big
4   mufflers. I took the top clamp off. I
5   took the bottom clamps off to pick it up.
6   On a T-600 Kenworth, you've got a guard
7   comes around. You have to pick the
8   muffler up over the guard and out. When
9   I picked it up over the guard and coming
10  out with it at an angle, I had to come
11  out of the bracket at the top. And it
12  was pushing me backwards.
13       So when I tripped, the
14  muffler -- I fell on my back, and the
15  muffler hit me in the stomach, same place
16  I hit the tarp rack.
17  Q.   Where were you working on the
18  muffler?
19  A.   At home, my shop.
20  Q.   You stated earlier that this
21  happened around 11:00 a.m.; is that
22  correct?
23  A.   Yes.

Page 77

1   Q.  Had you made any deliveries
2   that day?
3   A.  No. It's been a while back.
4   I don't believe so. Seemed like the
5   truck was loaded with pea gravel when the
6   pipe blowed out. You have to fix it
7   because DOT will shut the truck down if
8   they catch you because of exhaust going
9   to the cab of the truck with the driver.
10  Q.  When had the pipe broke?
11  A.  Bringing it in, you know,
12  fixing to take a load to haul it. We was
13  taking a load off. He brought it in to
14  the house because the pipe busted.
15  Q.  Who brought it into the house?
16  A.  I forgot who was driving for
17  me then. I can check on it.
18  Q.  This was not the truck you
19  were driving at that time?
20  A.  Not right there at the time,
21  it wasn't. But I was going to take it
22  off.
23  Q.  So would this have been Clyde

Page 78

1   or Mark who was driving the truck?
2   A.  No, wouldn't be one of those.
3   Q.  But it was another person with
4   whom you had contracted to drive one of
5   your trucks; is that correct?
6   A.  Yeah. It was my truck.
7   Q.  When the pipe burst, you were
8   not driving the truck; is that correct?
9   A.  No.
10  Q.  Would you have records at home
11  that would be able to show who the driver
12  was on that truck at that time?
13  A.  I might have. I would have to
14  look. I should have receipts for the
15  parts that were purchased to fix the
16  truck.
17  Q.  Did you purchase the parts to
18  fix that truck from Godwin Material?
19  A.  I don't remember if I got them
20  from them or the parts house.
21  Q.  Where is the parts house?
22  What is that?
23  A.  Well, we use several different

Page 79

1   ones: Capitol Volvo, Fleet Pride,
2   Freightliner, Kenworth, Peterbilt.
3   Q.  So I'm correct that you don't
4   purchase all of your parts from Godwin
5   Material; is that correct?
6   A.  No.
7   Q.  Is there a shop at Godwin
8   Material where you can work on your
9   trucks?
10  A.  They have their own shop,
11  yeah.
12  Q.  Does the shop at Godwin
13  Material ever make any repairs on the
14  trucks you own?
15  A.  They have when my hips was --
16  I had surgery on my hip.
17  Q.  When Godwin Material did work
18  on your trucks when you were injured with
19  your hip, in addition to any parts that
20  you had to purchase for those trucks, did
21  you have to pay Godwin Material for any
22  labor?
23  A.  No.

Page 80

1   Q.  Did you have to pay for
2   anything besides parts?
3   A.  No.
4   Q.  Have you ever worked on a
5   truck at the shop at Godwin Material?
6   A.  Yeah.
7   Q.  When have you worked on a
8   truck at Godwin's shop?
9   A.  It's been a couple of years
10  back. I put a back end in one,
11  transmission on one.
12  Q.  Was this work you were doing
13  on trucks you owned?
14  A.  On my trucks, yeah.
15  Q.  How do you decide whether to
16  do the work at your house or at the shop
17  at Godwin when you're repairing your own
18  trucks?
19  A.  Well, it's according to where
20  it breaks down at. We take it to the
21  closest place.
22  Q.  Do you do all your repair on
23  your own trucks?

Page 85

1  paper. I forgot exactly which day I did
2  go.
3     Q.  On this paper?
4     A.  No. It was on one my wife
5  left.
6        MS. RICHARDSON: The package
7  that I gave you earlier with the
8  insurance coverages.
9        MS. CRUNK: Okay. All the
10 sheets that you gave me earlier relate to
11 the hip problem.
12    Q.  (BY MS. CRUNK:) Did you go to
13 the doctor the next day?
14    A.  I'm not sure. I think -- I
15 would have to see exactly which day it
16 fell. I went a couple of days after,
17 next day or a couple after. I can find
18 the records at the house if you want me
19 to.
20       MS. RICHARDSON: Well, it will
21 be reflected in the medical records, too,
22 I'm sure.
23    A.  Yeah.

Page 86

1     Q.  Did you call Cindy or anyone
2  else at Godwin Material the day of the
3  accident to let them know?
4     A.  The next day I did.
5     Q.  Who did you speak with?
6     A.  Cindy.
7     Q.  What did you tell Cindy?
8     A.  Told her I had a muffler fall
9  on me, hit me in the same place I hurt
10 myself with the tarp rack.
11    Q.  Did you fill out a claim at
12 that time?
13    A.  No.
14    Q.  Did you request that Cindy
15 make a claim at that time?
16    A.  No. They don't ever ask you
17 to make a claim. They just tell you to
18 report it. And then when you go to the
19 doctor and everything, then you'll get
20 your papers and fill them all out. The
21 doctor fills his part out.
22    Q.  Who did you get the papers
23 from that you filled out for your hernia?

Page 87

1     A.  I think from Cindy. On the
2  hernia, I went to see Dr. Hood, and then
3  Dr. Hood called Dr. McGowin. He was the
4  surgeon.
5     Q.  Take a look at these two
6  sheets for me, if you will.
7     A.  (Reviewing document.)
8     Q.  Do you remember filling out
9  that form?
10    A.  My wife filled the top part
11 out, I know.
12    Q.  Is that your signature on the
13 bottom of the page?
14    A.  Yes.
15    Q.  Both pages?
16    A.  Yes.
17    Q.  Okay.
18    A.  Some of this I believe is what
19 the doctors filled out.
20       MS. RICHARDSON: Can we mark
21 that?
22       MS. CRUNK: Sure.
23       (Whereupon, Defendant's

Page 88

1        Exhibit 2 was marked for
2        identification.)
3     Q.  (BY MS. CRUNK:) Okay. It
4  looks like to me here it said the injury
5  occurred on the 11/22nd/03. And here it
6  says, "When is the first date that you
7  consulted a physician for this condition?
8  December 4th, 2003." Do you agree with
9  me that that's what it says?
10    A.  That's what it looks like it
11 says. Yes.
12    Q.  This sheet that you signed is
13 dated January 8th, 2004. Is that the
14 first form you filled out regarding your
15 hernia claim?
16    A.  I'm not sure.
17    Q.  Okay.
18    A.  The 8th, the 8th is when I
19 went back to have the staples taken out.
20    Q.  Okay. This is a copy of the
21 complaint that you filed, and I'm going
22 ask you to look at page three,
23 specifically paragraphs 11 and 12. Would

Page 93

1  while back.
2  Q.  Was this someone with AIG or
3  was --
4  A.  AIG.
5  Q.  Was this a telephone
6  conversation or did this happen through
7  written correspondence?
8  A.  It was on the telephone.
9  Q.  Did you call AIG?
10  A.  Yeah.
11  Q.  Where did you get the phone
12  number you called?
13  A.  They've got one on their card
14  we have. Like on the hip, I can tell you
15  who I talked to then.
16  Q.  What did you ask the person
17  you spoke with at AIG?
18  A.  Just asked them had they
19  received the papers and all. And they
20  said yes, it would be taken care of, you
21  know, being processed. But, you know,
22  nothing ever happened.
23  Q.  When was the next time you

Page 94

1  either spoke to or wrote or received
2  correspondence from AIG?
3  A.  I'm not sure. I think she
4  received a letter saying it was denied,
5  you know.
6  Q.  I'll show you this sheet and
7  ask you to read it.
8  A.  (Reviewing document.) Cindy's
9  got it marked "no" on here.
10  Q.  Is this incorrect that the --
11  A.  That's incorrect.
12      MS. RICHARDSON: Can we mark
13  that exhibit, please?
14      MS. CRUNK: Sure.
15      (Whereupon, Defendant's
16      Exhibit 3 was marked for
17      identification.)
18  Q.  (BY MS. CRUNK:) So it's
19  incorrect when it says, "Was this vehicle
20  loaded at the time of the accident"?
21  A.  Where she said no, that is
22  incorrect.
23  Q.  I would like to show you this

Page 95

1  and have you read that.
2  A.  (Reviewing document.) I've
3  read all this.
4  Q.  You recall receiving this
5  letter?
6  A.  Yes.
7  Q.  After you received this letter
8  that says, "According to the information
9  we received, you were not under dispatch
10  nor was your truck loaded at the time of
11  the accident," did you ever tell anyone
12  at AIG that this was incorrect?
13  A.  Yes. I told Hank Strott, the
14  agent at Palomar.
15  Q.  That -- what did you tell Hank
16  Strott?
17  A.  I told him the truck was
18  loaded and it was under dispatch. Y'all
19  have totally rewritten the policy since
20  this. My son has the other ones at home,
21  the new one. They have changed it all
22  up.
23  Q.  Hank Strott was your agent at

Page 96

1  Palomar; is that what you said?
2  A.  That's right.
3  Q.  Did you have a telephone
4  conversation with Mr. Strott?
5  A.  Yeah, several of them.
6  Q.  What did Mr. -- I'm sorry,
7  what is his last name?
8  A.  Strott, I think.
9  Q.  Strott. Did Hank Strott tell
10  you he was going to do something about
11  this information?
12  A.  Yes. He said he would correct
13  it, have it corrected.
14  Q.  Did Mr. Strott ever tell you
15  that he did have it corrected?
16  A.  No. But he said I should --
17  he said he had it pretty well under
18  control, he thought.
19  Q.  When were you having these
20  conversations with Mr. Strott?
21  A.  Probably end of February.
22  Q.  You had spoken with someone at
23  AIG before you received this letter; is

Page 97

1 that correct?
2     A.   Yes.
3     Q.   Did you speak with anybody at
4 AIG after you received this letter?
5     A.   I don't remember. I called
6 them several times, you know, but don't
7 recall when I did.
8     Q.   Did you ever tell anybody at
9 AIG that this information in this letter
10 was incorrect?
11     A.   Yes, I told them it was
12 incorrect.
13     Q.   Who did you tell at AIG that
14 this information was incorrect?
15     A.   I don't know who. It was some
16 lady.
17     Q.   Did you ever receive any other
18 correspondence from AIG besides this
19 letter?
20     A.   No, not that I recall. If I
21 did, it should be in amongst these papers
22 somewhere.
23     Q.   After you spoke with

Page 98

1 Mr. Strott and he told you that he had it
2 pretty much under control, did you ever
3 speak to him again to notify him that it
4 had not been changed as far as you knew?
5     A.   No. I mean, he knew through
6 Jerry. I talked to Jerry Godwin, and
7 Jerry talked to him and all, you know.
8     Q.   How long were you out of work
9 as a result of the hernia?
10     A.   Probably about six weeks.
11     Q.   Do you have any pending
12 medical bills as a result of the surgery
13 or any expenses associated with your
14 hernia injury?
15     A.   No. I don't think I've
16 received anything lately on that.
17     Q.   Have you ever had a hernia
18 prior to this hernia that you received
19 from the muffler falling on you?
20     A.   No.
21     Q.   Have you had any hernias since
22 that one?
23     A.   No.

Page 99

1     Q.   Do you have any continuing
2 pain in your stomach from the muffler
3 falling on you?
4     A.   No.
5     Q.   After you went back to work
6 after your hernia injury, did you go back
7 to work in the same capacity as you had
8 before?
9     A.   You had to be easier climbing
10 in and out of the truck and all.
11     Q.   Is there anything that you
12 could do before your hernia injury that
13 you cannot do now?
14     A.   No.
15     Q.   Did you speak with anyone
16 besides Mr. Strott at Palomar regarding
17 your hernia claim?
18     A.   Yes. One girl named Suzanne,
19 I think.
20     Q.   Did you tell Suzanne anything
21 about AIG stating you were not loaded at
22 the time of the accident and you said you
23 were?

Page 100

1     A.   I don't recall.
2     Q.   So as far as you know,
3 Mr. Strott at Palomar is the only person
4 you had a conversation with regarding
5 this misinformation in the letter?
6     A.   Yes.
7     Q.   Besides Jerry Godwin or Cindy
8 Jordan, did you have any conversations
9 with anybody else at Godwin Material
10 about your hernia claim?
11     A.   No.
12     Q.   According to this sheet, it
13 says, "When did you become totally
14 disabled, unable to work?" And it says
15 "12/29/03." Did you work from 11/22 when
16 the accident occurred until 12/29/03?
17     A.   Yeah. Yeah.
18     Q.   The next line, it says, "When
19 were you able to again perform part of
20 your occupational duties?" And you say,
21 "There is no light duty in my job, having
22 to pay someone to keep truck up." Who
23 did you pay to keep your truck up?

Page 101

1   A.   My youngest son.
2   Q.   Did you pay your youngest son
3   to help you fix the muffler that day?
4   A.   No. He just fixed it.
5   Q.   Had he helped you work on your
6   trucks in the past?
7   A.   Yes.
8   Q.   Had you paid him in the past
9   for his work on your trucks?
10  A.   Yes.
11  Q.   Why weren't you paying him the
12  day that he was helping you with the
13  muffler?
14  A.   Well, he was in the shop
15  messing with his car when it fell. Then
16  when I got hurt, they finished it up. It
17  wasn't but a 30-minute thing.
18  Q.   So you had paid your youngest
19  son in the past to help you work on your
20  trucks before you were injured?
21  A.   Yeah. I pay him now, too.
22  Q.   Are you alleging any pay that
23  you haven't paid your youngest son as a

Page 102

1   result of this injury as damages in this
2   lawsuit?
3   A.   No. I just, you know, just
4   pay him for working on whatever he does.
5   He goes to college. He doesn't work, a
6   regular job, so we do that.
7   Q.   You stated earlier that you
8   went to see Dr. Hood for your hernia
9   first; is that correct?
10  A.   Yes.
11  Q.   And then he referred you to
12  Dr. McGowin; is that correct?
13  A.   Well, I was seeing Dr. Hood.
14  They are in the same office. And
15  Dr. Hood looked at me and checked me.
16  And he said, well, let me get Norman. So
17  he walked out of the room, come back in
18  about five minutes with old Norman
19  McGowin. He checked me. He said, you
20  need it fixed. He said that's what made
21  my stomach and all hurt.
22  Q.   Besides Dr. Hood and
23  Dr. McGowin, did you see any other

Page 103

1   doctors as a result of your hernia?
2   A.   No.
3   Q.   I'm going to show you your
4   answer to interrogatory number three. If
5   you would like to read it, you can.
6   A.   Answer number three.
7   (Reviewing document.) I have no idea.
8        MS. RICHARDSON: You want him
9   to read the answer?
10       MS. CRUNK: Yes, the answer.
11       MS. RICHARDSON: The question
12  is: "Describe in detail the nature and
13  amount of damage alleged in the
14  complaint." And you say, "I should have
15  received disability payments of $500 a
16  week for six months under the insurance
17  policy while I was injured and
18  recovering. The policy should have paid
19  my surgery and treatment; therefore, I'm
20  asking for the amount of my medical
21  bills, injury, mileage to and from
22  treatment and other incidentals." And
23  you have listed out here your hernia

Page 104

1   injury and what AIG paid.
2   A.   Yeah, they paid that.
3        MS. RICHARDSON: And then the
4   balance that is owed and the incidentals,
5   and that totals $4,875.
6   Q.   (BY MS. CRUNK:) Okay. I want
7   to go over right now this November 2003
8   breakdown you have. Your hernia injury,
9   you say, cost $12,315.50. AIG paid 7,500
10  of that, leaving a balance owed of
11  $4,815.50. Did you pay the $4,815.50 of
12  the balance on your hernia?
13  A.   No. Blue Cross did.
14  Q.   Has Blue Cross come back and
15  asked for any of the money it paid
16  relating to your hernia claim?
17  A.   They sent some letters about
18  it, said they paid a claim they didn't
19  think was right. Then I talked to them
20  about it, and they dropped it.
21  Q.   Do you have those letters that
22  Blue Cross Blue Shield sent you?
23  A.   I don't know. I would have to

Page 113

1  Ms. Gambino about this information being
2  incorrect in this letter?
3      A.  I don't remember if I did or
4  not.
5      Q.  So your dispute with your
6  hernia claim is that you should have been
7  paid $500 a week for disability payments;
8  is that correct?
9      A.  Yes.
10         MS. CRUNK: Let's take a
11 break.
12         (Recess.)
13     Q.  (BY MS. CRUNK:) I have a
14 couple more questions with regard to your
15 hernia claim. When the driver of the
16 truck called and told you that the pipe
17 had busted, did you tell him to bring the
18 truck into your shop? Is that correct?
19     A.  Yes.
20     Q.  Did the truck have to be towed
21 or could he drive it that far?
22     A.  No. He drove it in.
23     Q.  Okay. Did you notify anyone

Page 114

1  at Apek that the load was not going to be
2  delivered that evening?
3      A.  No.
4      Q.  Did you notify anyone at
5  Godwin that the load would not be
6  delivered?
7      A.  No.
8      Q.  Did you notify anybody at
9  Godwin that the pipe had burst on the
10 truck?
11     A.  No.
12     Q.  So the decision to fix the
13 muffler was your decision?
14     A.  Yes. Well, it was filling the
15 cab up with smoke. And the DOT will shut
16 you down for that. Then you will tow it
17 in or fix it beside the highway.
18     Q.  So the first time anyone at
19 Godwin knew that there was something
20 wrong with the truck is when you called
21 to report the muffler falling on you; is
22 that correct?
23     A.  That's correct.

Page 115

1      Q.  These sheets that you produced
2  to me today indicate that your last day
3  of work in 2003 was 12/22/03; is that
4  correct?
5      A.  That's correct.
6      Q.  And your first day of work
7  after your hernia was February 3rd, 2004;
8  is that correct?
9      A.  That's correct.
10     Q.  Okay. Let's move on from your
11 hernia injury to your hip injury. Tell
12 me what happened in October of 2004 when
13 you injured your hip and knee.
14     A.  Well, I was hauling to the
15 concrete company.
16     Q.  The same company that you were
17 hauling to in February of 2004?
18     A.  Yeah.
19         MS. RICHARDSON: Hang on just
20 a second.
21         (Off-the-record discussion.)
22         MS. RICHARDSON: Okay.
23     Q.  (BY MS. CRUNK:) So you were

Page 116

1  hauling to the concrete company?
2      A.  That's correct.
3      Q.  And then what happened?
4      A.  Well, I got out, opened the
5  tailgate of my truck, dumped my load of
6  sand out, pulled my truck forward. And I
7  started letting my bed down, so I stepped
8  out of the truck. And the front wheel
9  had went up on a mound, and I didn't know
10 it. I misjudged it. When I stepped out,
11 the bottom step was about two foot high
12 instead of about a foot high. And I
13 misjudged it, and I fell, which at the
14 time I thought I twisted my knee, you
15 know.
16     Q.  When that accident happened or
17 when you twisted your knee, did you get
18 back in the truck and drive for the rest
19 of the day?
20     A.  Yes. Well, I got up. You
21 know, I thought I would kick it off. I
22 was walking around kicking my knee, you
23 know, trying to get it to feel better.

Page 117

1   The load man, he seen me when I fell out.
2   He asked me, you know, was I all right.
3   I said, I think I just twisted my knee a
4   little bit. I got up, walked around,
5   thought I would walk it off.
6        And I got back in the truck
7   and went and hauled another load. And,
8   you know, I thought it was my knee. It
9   kept hurting, kept hurting. That went on
10  for -- I went to the doctor with it. He
11  gave me some medicine, x-rayed it and
12  all. And then it went on for another
13  week or so, and it wasn't getting any
14  better. So I went back to the doctor,
15  told him something had to be done.
16       So he got me an appointment
17  with Dr. Barrington. And
18  Dr. Barrington's assistant checked me,
19  twisted my leg, you know, the way they
20  check your knee and everything. He walks
21  out the door and meets Dr. Barrington.
22  The assistant tells Dr. Barrington, says,
23  it's not his knee; it's his hip. So

Page 118

1   Dr. Barrington said, I'll have to check
2   him.
3        He went on in there and he
4   checked me. When he popped my hip out,
5   you know, then when I left there, I had a
6   crutch, walking stick and all. And
7   that's the way it come out.
8   Q.   You said the load man saw you
9   trip or twist your knee?
10  A.   Yeah.
11  Q.   Who was that?
12  A.   Name was Robert. Do you have
13  his name and all? I turned it all in.
14  Q.   Is that the Robert --
15       MS. RICHARDSON: It should be
16  on the interrogatories.
17  A.   That might be them that I
18  didn't know their last name.
19  Q.   Let's look at them again.
20  A.   Yeah. Robert and Steve,
21  that's them. They don't work for Godwin
22  Material, though.
23  Q.   Who do they work for?

Page 119

1   A.   I'm not sure about Robert, but
2   Steve works for I think it's USA, Ready
3   Mix. I think they bought out the
4   concrete company.
5   Q.   Okay.
6   A.   I do believe it's Sylacauga
7   where he works. Now, Robert, I don't
8   know where he works now.
9   Q.   At the time, was he working
10  for Godwin Material?
11  A.   No. They were working for the
12  concrete company, both of them.
13  Q.   Both of them were?
14  A.   Yeah. They worked for the --
15  Q.   So they both saw that, saw --
16  A.   Steve was in the office. When
17  I walked in there, he seen me limping.
18  He asked me what happened. I told him I
19  twisted my knee.
20  Q.   Did you go into the office to
21  tell someone what had happened?
22  A.   I went and signed my -- he
23  signed my ticket.

Page 120

1   Q.   That's why you went in there
2   was to get your ticket signed?
3   A.   Yeah.
4   Q.   Did you call anyone at Godwin
5   Material that day and let them know that
6   you had --
7   A.   No, not that day. Because I
8   figured I would walk it off. It figured
9   it was just a little old sprain, it would
10  be all right.
11  Q.   I'll let you look at these two
12  sheets.
13  A.   (Reviewing document.) All
14  these are right.
15  Q.   Okay.
16       MS. RICHARDSON: Let's mark
17  these as exhibits.
18       MS. CRUNK: Let's mark it as
19  an exhibit. Let's mark it as one
20  exhibit.
21       MS. RICHARDSON: That's fine.
22  A and B.
23       (Whereupon, Defendant's

Page 121

1        Exhibits 4A and 4B were marked
2        for identification.)
3    Q.  (BY MS. CRUNK:) Is this your
4  signature on both of these page?
5    A.  Yes.
6    Q.  Did you fill out these sheets?
7    A.  No. My wife did.
8    Q.  Your wife did. According to
9  this sheet, it was October 27th, 2004
10 when you twisted your leg?
11   A.  Uh-huh.
12   Q.  Does that sound right?
13   A.  Yes.
14   Q.  It also says at approximately
15 11:00 a.m.
16   A.  Yes.
17   Q.  So did you drive for the rest
18 of that day?
19   A.  Yes, I drove the rest of the
20 day. Well, I knocked off early because
21 it started hurting bad.
22   Q.  It says you first consulted a
23 physician on November 5th, 2004.

Page 122

1    A.  Uh-huh.
2    Q.  Does that sound right to you?
3    A.  Yes.
4    Q.  Did you work from October 27th
5  until November 5th?
6    A.  Seemed like that was -- the
7  27th, seemed like it was on a Thursday.
8  I tried working some Friday, and then we
9  didn't work Saturday or Sunday. Then I
10 got my appointment. You know, I tried
11 working, and it kept getting worse. So I
12 called and got me an appointment with
13 Dr. Adams. I mean, I would be coming
14 home early because riding up and down the
15 bypass here in Montgomery with all the
16 red lights, you couldn't clutch the
17 truck.
18   Q.  This one signed by you on
19 December 8th, 2004, is that when you
20 first went and notified anybody at Godwin
21 that you had twisted your knee?
22   A.  I'm not sure. I did -- I told
23 Cindy I twisted my knee. That's what I

Page 123

1  thought it was wrong with me.
2    Q.  Did you tell Cindy about your
3  knee before you went to the doctor?
4    A.  Yes.
5    Q.  Did Cindy give you this form
6  to fill out?
7    A.  I don't know. Looks like
8  something she faxed to the house, you
9  know.
10   Q.  Okay. So you go to -- you
11 said you went to the doctor, got some
12 medicine and an X-ray and went back to
13 the doctor because your knee was still
14 hurting. And then when you went back to
15 the doctor is when you found out that it
16 was a hip injury; is that correct?
17   A.  That's correct.
18   Q.  What did Dr. Barrington tell
19 you when he determined it was your hip,
20 not your knee?
21   A.  Said you have to have surgery.
22 They x-rayed it and all.
23   Q.  Was this your left hip?

Page 124

1    A.  Yes.
2    Q.  What kind of surgery did he
3  tell you you were going to have to have?
4    A.  The total hip replacement.
5    Q.  The first time you went to the
6  doctor for your knee, did you go see
7  Dr. Adams?
8    A.  Yes.
9    Q.  And then Dr. Adams referred
10 you to Dr. Barrington?
11   A.  Barrington.
12   Q.  Did Dr. Adams refer you to
13 Dr. Barrington that first time you went
14 to the doctor?
15   A.  No, when I went back. Because
16 he told me he had done all he could do
17 for me.
18   Q.  When did you have your surgery
19 on your hip?
20   A.  February the 10th, I believe
21 it was.
22   Q.  I'll show you this letter.
23   A.  (Reviewing document.)

Page 129

1  regarding a specific bill?
2      A.   Well, the bills, benefits
3  you're supposed to -- you know, $500 a
4  week payment and all that. See, I was
5  out of work a long time before I had the
6  surgery. I mean, you don't just -- you
7  know, you just cannot walk in there and
8  get a hip replacement, you know, like a
9  lot of surgeries and all.
10     Q.   How long were you out of work
11 for your hip injury?
12     A.   I was out from -- I would have
13 to look at that. After I went to
14 Dr. Barrington, I couldn't drive no more.
15     Q.   Did Dr. Barrington tell you
16 you couldn't drive anymore?
17     A.   No. He don't have to tell you
18 when your hip is gone. No, he don't have
19 to tell you you can't drive. So I went
20 home and got the surgery lined up. And
21 the quickest he could do it was in
22 February. When he did the surgery in
23 February, they brought me home on an

Page 130

1  ambulance. I had to stay in the house
2  for six weeks, couldn't walk out,
3  couldn't put no weight on the left leg.
4      Then I went back to him. He
5  told me not to do anything for six more
6  weeks, said I could walk outside a little
7  bit, you know. Then they said they
8  wanted to put a pin in my right side to
9  keep it from collapsing, experimenting
10 with it. So they did that, and it worked
11 for a while. I was out about six, seven
12 weeks with that. Then when it failed, I
13 went back and had the other one done.
14 They took the hardware out and put
15 another new hip in.
16     Q.   So your second hip replacement
17 surgery was for your right hip; is that
18 correct?
19     A.   Yeah. They way Dr. Barrington
20 told me, he said that me not knowing I
21 had that blood disease, he said, the
22 insurance should cover it. But, I mean,
23 that's -- you know, he told me that his

Page 131

1  self. But he said, your other one is
2  going to have to be fixed. Blue Cross
3  will take care of those. So I didn't
4  bother AIG filing on the pin. I didn't
5  bother them with filing on the other hip
6  either.
7      Q.   So you're not claiming any
8  damages regarding the pin put in your
9  right hip or your right hip replacement
10 under your occupational accident policy;
11 is that correct?
12     A.   I didn't file it on it. But
13 my left one, you know, AIG.
14     Q.   When you received this letter
15 that stated, "The disability claim forms
16 completed by Dr. Barrington on January
17 7th, 2005 indicated avascular necrosis of
18 both hips with collapse on the left side.
19 When we corresponded with
20 Dr. Barrington's office to clarify the
21 reason for your disability we were
22 provided office records that state
23 November 22nd, 2004, Mr. Godwin is here

Page 132

1  with complaint of pain in the left leg
2  and hip. He says that he had not had any
3  specific injury to the hip. When we
4  spoke with Dr. Barrington directly, he
5  stated that your condition was an
6  underlying condition that was aggravated
7  by work. He says you had this condition
8  but were not aware of it," did you call
9  Stephanie Pines after you received this
10 letter?
11     A.   Yes.
12     Q.   And what did you ask her?
13     A.   Asked her about all of it. We
14 talked. She said that it was under
15 review. I mean, that was her favorite
16 word anytime you asked her anything.
17     Q.   Did she say it was under
18 review both before and after this letter?
19     A.   Every time you ever talked to
20 her, it was under review.
21     Q.   Did you talk to Dr. Barrington
22 about this letter?
23     A.   That's who wrote them another

33 (Pages 129 to 132)

Page 137

1    Q.    When did you have the pin put
2  in your right hip?
3    A.    June of last year, I think it
4  was.
5    Q.    June 2005?
6    A.    Yeah.
7    Q.    When did you have your second
8  hip replacement?
9    A.    Been so many of them. I
10 really need my wife. She can tell you
11 all the dates.
12       MS. RICHARDSON: What year was
13 it, to start with?
14   A.    2005.
15   Q.    Okay. After the pin, correct?
16   A.    Yeah.
17   Q.    So, the last half of June
18 2005?
19   A.    Yeah.
20   Q.    Just so I'm clear, are you
21 contending that AIG owes you any benefits
22 for the pin or the second hip
23 replacement?

Page 138

1       MS. RICHARDSON: No.
2    A.    No.
3    Q.    Just the left hip --
4    A.    The left hip.
5    Q.    -- surgery? Prescriptions,
6  you have a total of 97.46; medical
7  supplies, 144.55; and incidentals of --
8  is that $525? Do you have any
9  documentation to support these figures
10 that you provided?
11   A.    Yeah.
12       MS. CRUNK: I would like to
13 just make a request for those.
14       MS. RICHARDSON: I've already
15 given it to you, I think.
16       MS. CRUNK: Well, I'll check.
17       MS. RICHARDSON: But I'll
18 check.
19   Q.    (BY MS. CRUNK:) And the
20 disability payments not made are for 26
21 weeks and three days, and was that
22 figured at $500 a week also?
23   A.    Yes.

Page 139

1    Q.    Are there any other damages
2  that you are claiming, compensatory
3  damages that you are claiming for either
4  of these claims other than those outlined
5  on this sheet and your response to
6  interrogatory number three?
7       MS. RICHARDSON: Would you
8  break that down for him, compensatory
9  damages?
10   Q.    Are there any out-of-pocket
11 damages that you're claiming, money that
12 you had to pay or that you're liable for
13 other than these as outlined in your
14 answer for interrogatory number three?
15   A.    Like the ambulance bills and
16 stuff like that?
17       MS. RICHARDSON: Yes,
18 anything.
19   A.    I don't know. I've got to
20 check all the records and everything.
21 But I know like the ambulance, I had to
22 pay that, and I had to pay the co-pays at
23 the hospital.

Page 140

1    Q.    The ambulance bill, did you
2  submit that to Blue Cross Blue Shield?
3    A.    Yeah.
4    Q.    And was the claim denied?
5    A.    Paid $20 on it.
6    Q.    Did you have to have an
7  ambulance to bring you home because you
8  had to lay flat?
9    A.    Yes. The doctors requested
10 that.
11   Q.    Now, I just want to go through
12 these documents y'all gave me so I'll
13 understand what they are. I just
14 received this zero check from Godwin
15 Material.
16   A.    Yes.
17   Q.    Can you tell me what this is?
18   A.    That's to show you that I did
19 not work during the time of that hernia.
20   Q.    What's this handwritten note,
21 "took out of March G 108"?
22   A.    Well, the money shows like on
23 the -- the secretary wrote that. It's