IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| OLLIE GODWIN | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   2:05-cv-00783-SRW |
| NATIONAL UNION FIRE INSURANCE | ) |
| COMPANY OF PITTSBURGH, INC., | ) |
| ET AL., | ) |
| | ) |
|     Defendants. | ) |

## **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

COMES NOW, the Plaintiff and submits his response to defendants Motion for Summary Judgment as follows:

### STANDARD OF REVIEW

Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Green v. Pittsburgh Plate & Glass Co., 224 F. Supp. 2d 1348, 1352 (N.D. Ala. 2002)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A judge's guide is the same standard necessary to direct a verdict: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether [*3] it is so one-sided that one party must prevail as a matter of law.'" *Id.* at 259. "Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore, the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

Fraley v. Cincinnati Ins. Co., 2006 U.S. Dist. LEXIS 64158, 2-3 (D. Ala. 2006).

1

## STATEMENT OF DISPUTED FACTS

**2003 INJURY CLAIM**

1.      On October 22, 2003 Ollie Godwin, while rolling a tarp on his trailer, slipped and the tarp bracket hit him in the side. He reported this injury to Cindy Jordon at Godwin Materials, Inc. The injury gave Mr. Godwin a little problem, but wasn't bad. (Exhibit 1 pg. 65:17-23 and 66: 1-8 and 69).[1]

2.      Mr. Godwin continued to work after getting hurt on October 22 (Exhibit 1 pg. 72:10-23 and 73: 1-5) and (Exhibit 2).[2]

3.      One month later, Godwin was working on his truck and dropped a muffler on the same place he had injured in the earlier accident. This resulted in Mr. Godwin seeking medical treatment and ultimately surgery to repair a hernia. (Exhibit 3).[3]

4.      It was after Godwin was hurt on November 22, 2003 that the hernia came up. (Exhibit 4).[4]

5.      On November 22, 2004 Godwin was under dispatch for Godwin Materials, Inc. (Exhibit 5).[5]

6.      Godwin had made three deliveries on the day of his injury. Godwin was repairing one of his trucks that had blown an exhaust pipe at around 11:00 a.m. before hauling another load. (Exhibit 1 pg. 77). (Exhibit 5).

7.      The NUFI occupational accident policy defines "Owner Operator" as one who 1)"owns or leases a vehicle which he or she is operating for the purpose of performing Occupational services in the course and scope of contractual obligations for the Policyholder [Godwin Materials, Inc.] 2) is an independent contractor as defined by law; and 3) is not an employee of the policy holder. (Exhibit 6 pg. 2).[6]

---

[1] Exhibit 1: Excerpts from Deposition of Ollie Godwin.
[2] Exhibit 2: Commission Report
[3] Exhibit 3: Stabler Hosptial Record 12/29/03
[4] Exhibit 4: Report of Dr. Danny Hood 12/4/03
[5] Exhibit 5: Commission Report for 11/22/06
[6] Exhibit 6: Excerpt pg.2NUFI Policy

8. Godwin performs repairs on his trucks as part of his contractual obligations to the Policyholder, Godwin Materials, Inc. (Exhibit 7 ¶1).[7]

9. The NUFI occupational accident policy defines "Occupational" as "with respect to any activity, accident, incident, circumstance or condition involving an Insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the course of the Insured performing services within the course and scope of contractual obligations for the Policyholder, while under Dispatch. Occupational does not encompass any period of time during the course of everyday travel to and from work." (Exhibit 6 pg.2).

10. The NUFI policy defines "Dispatch" as "the period of time during which an insured operates his or her vehicle, or performs vehicle repair, while being in route to pick up a load, picking up a load, en route to deliver a load, and unloading a load." (Exhibit 6 pg. 2).

11. Godwin reported his injury to Cindy Jordan at Godwin Materials, Inc. He worked the rest of the week and went to see Doctor Danny Hood eleven days later.(Exhibit 4).

12. Cindy Jordan filled out the initial claim form sent to Palomar Ins. She wrote on the form that Mr. Godwin was at home. However, the question asked was "where was the driver scheduled to be at the time of the accident? (Exhibit 11 pg. 15: 8-12 and Exhibit 12).[8] Ollie Godwin was at his home shop making repairs but was scheduled to pick up and deliver loads. (Exhibit 7 pg. 1 ¶ 2). All of the claim forms filled out by Godwin and his medical provider's state: "Came home to fix muffler. Working on truck, muffler hit me in the lower stomach on Nov. 22, 2003 around 11:00 a.m." (Exhibit 20 pg. 1-5).[9] Additionally, Godwin's Commission reports show he had made three deliveries that day. (Exhibit 5).

13. Cindy Jordon does not consider making necessary repairs to a truck "under dispatch". (Exhibit 11 pg. 17:10-23 and pg. 18: 1-11). When filling out the initial claim form for Godwin, she answered the question: "If unloaded, was the driver under dispatch to pick up the load?" No. Where was

---

[7] Exhibit 7: Affidavit of Ollie Godwin
[8] Exhibit 11: Deposition of Cindy Jordon.
[9] Exhibit 20: NUFI Proof of Loss Forms

the driver scheduled to be at the time of the accident? Home." (Exhibit 12). Jordon admits that she is not familiar with the AIG policy and has never seen it. (Exhibit 11 pg. 20: 11-23).

14.  Dr. Hood diagnosed Godwin with a hernia and referred him for surgery. (Exhibit 4).

15.  On December 10, 2003 Palomar Insurance Agency, faxed Godwin Materials a claim form for use by Godwin. Godwin filled out a proof of loss claim form and submitted it to Palomar agent Suzanne Adger. (Exhibit 8).[10]

16.  The NUFI policy states: "Claim Forms. The Company will send claim forms to the Claimant upon receipt of a written notice of claim. If such forms are not sent within 15 days after giving of notice, the claimant will be deemed to have met the proof of loss requirements upon submitting, within the time fixed in the Policy for filing proofs of loss, written proof covering the occurrence, the character and the extent of the loss for which the claim is made. The notice should include the insured's name, the Policyholder's name and the Policy number.

17.  Godwin filled out the initial claim form when it was made available to him; eighteen days after the injury and within the time allowed under the policy. (Exhibit 12)[11](Exhibit 1 pg. 87-88) and (Exhibit 8).[12]

18.  The policy states: "Proof of Loss. Written proof of loss must be furnished to the Company within 90 days after the date of loss. ... Failure to furnish proof within the time required neither invalidates nor reduces any claim if it was not reasonably possible and in no event, except in the absence of legal capacity of the claimant, later than one year from the time proof is otherwise required." (Exhibit 9 No. 3).[13]

---

[10] Exhibit 8: Faxed Proof of Loss Claim Form 12/10/03

[11] Exhibit 12: Initial Claim Form dated 12/10/03
[12] Exhibit 8: Cover letter for Initial Claim Form 12/9/03
[13] Exhibit 9: Excerpt NUFI Policy pg. 13

19. The NUFI insurance policy has a "Hernia Coverage Rider" which waives the exclusion of hernias in the policy and allows recovery of Temporary Total Disability and Accident Medical Expense and in pertinent part states as follows(Exhibit 10 ¶2):

"Any reference to an injury or accident as defined in the policy is hereby deemed to include Hernia. Benefits will be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in part by, contributed to in whole or in part by, or resulting in whole or in part from, the Insured Person's Hernia, provided such Hernia is surgically repaired while the Insured Person's coverage is in force under the policy, subject to the following:

20. With respect to the Temporary Total Disability Benefit, the period for which such indemnity shall be payable for all periods of disability, subject to the Temporary Total Disability Benefit Waiting Period, shall not exceed the Hernia Lifetime Maximum Benefit Period shown in the schedule. (Exhibit 10 No. 1).[14]

21. Godwin made a claim for disability benefits under the policy. NCUI determined that the claim was "non-occupational" therefore, disability benefits were not paid. (Exhibit 17).[15]

23. Jerry Godwin sent a letter to NUFI explaining that Godwin was under dispatch on both days he was hurt. (Exhibit 19).[16]

## ARGUMENT

There are four elements a plaintiff must prove in a breach of contract claim.

A plaintiff can establish a breach-of-contract claim in Alabama by showing "(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." State Farm Fire & Cas. Co. v. Slade, 747 So. 2d 293, 303 (Ala. 1999) (quoting Southern Medical Health Systems, Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala. 1995).

Black-Gammons v. Zurich Am. Ins. Co., 2006 U.S. Dist. LEXIS 1942 (D. Ala. 2006)

---

[14] Exhibit 10: Hernia Coverage Rider ¶2 and No. 1 and 2
[15] Exhibit 17: Denial letter 2/27/04
[16] Exhibit 19: Letter from Jerry Godwin 3/17/2004.

In this case the first element is not in dispute because there is a valid insurance contract between NCUI and Ollie Godwin.

## 2003 HERNIA CLAIM

The Defendants assert that they fulfilled their obligations under the insurance contract when they paid the Non-Occupational Accident Medical Expense Benefit of $7,500.00 for Mr. Godwin's hernia operation. A factual dispute exists between the Plaintiff and Defendant about whether the injury was an "Occupational Injury" thereby entitling Godwin to disability payments of $500.00 per week while he was recuperating after the hernia surgery.

Godwin relies on the policy language defining "Dispatch" as "the period of time during which an insured operates his or her vehicle, **or performs vehicle repair**, while being in route to pick up a load, picking up a load, en route to deliver a load, and unloading a load." Godwin meets this definition because he was performing a vehicle repair while in route to pick up a load. Godwin was operating his vehicle which is shown in the Commission Report. Godwin owns three trucks, all of which are leased to Godwin Materials, Inc. The truck he was working on at the time of his injury was in route to pick up a load for Godwin Materials' and Godwin was repairing it under his contractual obligation to Godwin Materials. All three of the trucks Godwin owns were making deliveries pursuant to the contract between Godwin and Godwin Materials. The policy clearly covers performance of "vehicle repairs" made while picking up and delivering loads. Godwin was performing a necessary repair after which he would have delivered or picked up another load (Exhibit 1 pg. 77). The definition of Occupational as defined in the policy covers these circumstances:

"Occupational" as "with respect to any activity, accident, incident, circumstance or condition involving an Insured, that the activity, accident, incident, circumstance or condition occurs or arises out of or in the

6

course of the Insured performing services within the course and scope of contractual obligations for the Policyholder, while under Dispatch.

Certainly under the circumstances presented it can be concluded that Godwin was under dispatch and performing an occupational activity when the injury occurred. At the very least the policy does not preclude Godwin from swapping trucks with another driver to make a necessary and unexpected repair while hauling to and from Godwin materials. Godwin is covered so long as he is performing services within the course and scope of his contractual obligations and he is under dispatch if he performs vehicle repairs while en route.

Furthermore, the policy does not exclude Godwin's home shop which happens to be located in north Crenshaw County, between Godwin Materials and the Hyundai Plant where deliveries were being made.

This is not a case of "strained or twisted reasoning" as the Defendants have suggested. The question which must ultimately be answered by the jury is whether or not Mr. Godwin was en route to pick up or deliver for Godwin Materials when he repaired the muffler on the truck. The Commission Reports show that Mr. Godwin had delivered three loads the day of his injury. The repair of the muffler was made while he was traveling between the pickup and delivery point. He intended, but for the injury, to continue on his delivery route after the muffler was repaired. He was under dispatch and working pursuant to his contract with Godwin Materials when the injury occurred.

In this case the plain meaning of the policy should apply with the usual and ordinary understanding of a truck driver such as Ollie Godwin. The policy includes time spent "performing vehicle repairs while being in route to pick up a load, picking up a load, en route to deliver a load, and unloading a load." The Defendants attempt to twist the plain meaning of the policy by saying that because he was not driving the same truck that he did when he started work that morning he was not under dispatch. Godwin was under dispatch no matter which truck he was driving or working on. Mr. Godwin's business

7

involves three trucks hauling from one place to another. Which truck he is driving or repairing does not determine whether he is en route, it is the fact that he is in the process of hauling loads from one place to another that determines whether he is en route to pick up or deliver.

The exclusion in the policy is to prevent claims by persons who are not using their trucks for work purposes. It defines a period of time, not limited by specific hours, by describing the work truck drivers do. The purpose of the exclusion is extremely important because work situations vary from day to day. In order to accomplish the job at hand a person needs to be flexible without fearing that the variation will result in a loss of coverage. On this issue the Alabama Supreme Court has found:

The exclusion should not be broadened to include circumstances that may vary from day to day but are still within the purpose intended by the language of the policy. "Further, this Court has ruled that exceptions to coverage must be interpreted as narrowly as possible to provide the maximum coverage available." Porterfield v. Audubon Indem. Co., 856 So. 2d 789, 799-800 (Ala. 2002) *citing* Sullivan v. State Farm Mut. Auto. Ins., 513 So. 2d 992, 994 (Ala. 1987).

It is the duty of the courts to take the words of an insurance policy as they are found in it, and as persons with usual and ordinary understanding would construe them when used to express the purpose for which they were employed. Alabama Farm Bureau Mut. Casualty Ins. Co. v. Goodman, 279 Ala. 538, 541 (Ala. 1966) *citing* Holloway v. State Farm Mutual Automobile Ins.Co., 275 Ala. 41, 151 So.2d 774; Franklin Life Ins.Co. v. Lewis, 36 Ala.App. 313, 55 So.2d 518.

In looking at the purpose of the exclusion it is easy to see that Godwin was under dispatch because he was tending to a repair that needed to be made to continue picking up and delivery on the day in question.

The Defendants wrongly state that the injury to Mr. Godwin, when he fell while rolling back the tarp on his truck, for which he did not seek treatment does not change the benefits under the policy. The Hernia Coverage Rider states:

> **Any reference to an injury or accident** as defined in the policy is hereby deemed to include Hernia. **Benefits shall be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in part by, or resulting in whole or in part from, the Insured Person's Hernia**, provided such Hernia is surgically repaired while the Insured Person's coverage is in force under this Policy. (Emphasis added). (Exhibit 10 ¶ 3).

8

Godwin hurt himself on October 22, 2003 but decided not to pursue medical treatment. Godwin's hernia may have happened when he fell in October, however it was not so bad that Godwin couldn't work or felt he needed medical treatment. When the muffler fell on him a month later he saw a doctor and was diagnosed with a hernia. The prior incident is covered by the language contained in the Hernia Rider if it partially contributed to the hernia. The exclusion language in the Rider is that the Hernia be surgically repaired and Godwin's hernia was surgically repaired. It is the fact that the hernia requires surgery that triggers coverage.

Godwin followed the procedure of reporting accidents to Godwin Materials when he filed a claim regarding his hernia on December 10, 2003 eighteen days after the accident. Suzanne Adger, the Palomar Agent sent the form to Cindy Jordon on the date of the accident (Exhibit 12).[17] NUFI required additional forms to be filled out later and Godwin did fill them out as requested.

Godwin therefore meets all the requirements of an occupational injury and any dispute about whether he was under dispatch is a fact to be determined by a jury.

## 2004 HIP CLAIM

### STATEMENT OF DISPUTED FACTS

1. Mr. Godwin had been working driving his truck without physical pain or problems during the year 2004. (Exhibit 7).

2. On October 27, 2004 Mr. Godwin had delivered a load of concrete and as he was getting out of his truck, he misjudged the distance between the step and the ground and fell. He thought he had twisted his knee. (Exhibit 1 pg. 116: 1-23 and Exhibit 18).[18]

3. On November 11, 2004 Dr. Adam's X-Ray report notes that "Bony structures are intact with no evidence of fracture or arthritic change. Cartilage space in the hip is well maintained.

---

[17] Exhibit 12: Claim Form signed by Cindy Jordan on 11/22/03.
[18] Exhibit 18: Commission Report 10/27/2004

9

4.      Nineteen days later Dr. Adam's assessment of Godwin's X-Rays revealed that there was Osteonecrosis of both femoral heads, bone marrow edema on the left femoral head and neck, bilateral hip effusions greater on the left and edema in the left quadratus femoris musculature.

5.      Godwin was referred to Dr. Barrington who found "osteonecrosis in both hips with collapse on the left side." Dr. Barrington also expressed "I do think it appears to be work related." (Exhibit 14 pg 2).[19]

6.      The NUFI policy defines injury as follows:

"Injury means bodily injury to an Insured person caused by an occupational accident while coverage is in force under the Policy, which results directly and independently of all other causes in a Covered Loss. All injuries sustained by an Insured Person in any one accident shall be considered a single injury."

7.      Despite the fact that NUFI denied Godwin's claim because "policy covers accidents only, sickness not covered," (Exhibit 21)[20] NUFI paid claims for the same accident on four different occasions totaling $2,193.02. (Exhibit 13).[21]

## ARGUMENT

This claim involves the interpretation of "Injury" as defined in the policy. The defendants assert a strict interpretation of the language stating that the injury "result directly and independently of all other causes." Ollie Godwin suffered from a latent disease, osteonecrosis, which he did not know he had until he injured himself stepping out of his truck. Before the accident, Godwin had been routinely working with no pain. After the injury he became unable to work due to the pain in his knee and hip. The Eleventh Circuit has addressed the strict interpretation of directly and independently of all other causes language in insurance policies.

---

[19] Exhibit 14: Medical Notes; Doctor Barrington 12/3/04
[20] Exhibit 21: Explanation of Benefits form denying claims for 10/27/03 accident.
[21] Exhibit 13: Explanation of Benefits form paying claims for 10/27/03 accident.

> We are persuaded by the reasoning of the Fourth Circuit. The coverage provided under the LINA policy at issue would be rendered almost meaningless if we were to adopt the strict interpretation advanced by Appellee. As the Fourth Circuit rightly pointed out, an overly strict interpretation of "directly and from no other causes" would provide insureds, or their beneficiaries, with coverage only where the insured was in perfect health at the time of an accident. The "substantially contributed" test gives this exclusionary language reasonable content without unreasonably limiting coverage. And, it advances ERISA's purpose to promote the interests of employees and their beneficiaries. See Firestone, 489 U.S. at 113, 109 S. Ct. 956. We therefore adopt the "substantially contributed" test as the federal common law of this circuit. Thus, we will not consider Mr. Dixon's pre-existing heart disease as a cause unless it substantially contributed to his death.

Dixon v. Life Ins. Co. of N. Am., 389 F.3d 1179, 1182-1185 (11th Cir. 2004).

No doubt Godwin's condition did in fact exist at the time of his fall; however it had not manifested itself into a disabling condition until after Godwin fell. Prior to the fall, Godwin was able to work each day. (Exhibit 2).[22] After the fall Godwin continued to work, although in pain, until November. (Exhibit 2). The medical records show that his condition continued to worsen after the fall.

The Alabama Court of Civil Appeals addressed similar circumstances and found:

> The defendant's assertion that plaintiff's preexisting condition is the sole cause of his current problems and disability and that the heart attack is not the cause of his disability is not supported by the evidence. To conclude that plaintiff would have suffered his present disability absent the occurrence of the heart attack is, at best, speculative. While it is possible that plaintiff's coronary artery disease would have become sufficiently symptomatic, in time, to result in by-pass surgery even in the absence of the heart attack, the fact remains that the preexisting condition did not prevent plaintiff from working in a normal manner prior to the attack, and plaintiff's treating physician considered plaintiff's condition under control prior to that time.

City of Fort Payne v. Barton, 621 So. 2d 993, 995-996 (Ala. Civ. App. 1993).

Applying the same reasoning to Godwin, to conclude that his osteonecrosis would have required him to have a hip replacement in the future, regardless of the accident, is speculative. While it is possible he would have began to suffer symptoms which would have required a hip replacement at some point in the future doesn't negate the fact that he was working up until the day of his fall without symptoms.

---

[22] Exhibit 2: Commission Report pgl. 1-7

11

> In dealing with accident policies whose coverage is defined by the general terms, such as death resulting directly and solely from the accidental injury, exclusive or independent of all other causes, this court has approved and adopted the rule announced by other courts to the following effect: . . . Where accidental injury aggravated a disease and hastened death so as to cause it to occur at an earlier period than it would have occurred but for the accident, it is the direct, independent, and exclusive cause of death at the time.
>
> This view of proximate cause is applied in our cases, notwithstanding the grave condition of the disease, and notwithstanding the accidental injury was such as not to be fatal but for the disease or bodily infirmity.

Liberty Nat'l Life Ins. Co. v. Bailey, 34 Ala. App. 199, 202-203 (Ala. Ct. App. 1949).

The Defendants rely on the decision in Black-Gammons because the immaterial facts are similar to Godwin's. Black-Gammons was a truck driver who was injured on the job and was covered by an occupational accident policy. However, the similarity ends there. In Black-Gammons the insurance company, after paying disability benefits, determined that Black-Gammons accidental injuries had healed and she was suffering from carpal-tunnel syndrome. An administrative law judge found that Black-Gammon's accidental injuries had healed and she had submitted no evidence showing that her remaining injuries were caused by the accident. Black-Gammons conceded that "except for her herniated discs . . . none of her diagnosed conditions is eligible for benefit coverage." Black-Gammons "did not argue that her degenerative disk disease was precipitated by the accident." Black-Gammons v. Zurich Am. Ins. Co., 2006 U.S. Dist. LEXIS 1942 pg. 8-10.

The facts present here show that Godwin was working before the accident and experienced pain which caused him to seek medical treatment after the accident. The initial x-rays did not show a collapse of the femoral head but later an MRI showed collapse. Dr. Barrington stated in his examination report that "I do think it appears that this is work related." (Exhibit 14 pg. 4). Dr. Barrington later explained his findings in a letter to Stephanie Pine of NUFI stating: "Probably he had an aggravation of a previously

underlying condition, which was the avascular necrosis. The injury probably caused him to collapse it and therefore have the pain that resulted in his need for the hip replacement operation." (Exhibit 15).[23]

Whether the accidental injury caused the hip to collapse is a question of material fact to be decided by a jury. Even Defendant's expert Dr. Daniel Michael does not exclude the possibility that but for the accident the hip would not have collapsed. He merely states that considering the time it takes for avascular necrosis to develop, in his opinion there was no relationship between the accident and the subsequent problems in Godwin's hip. (Exhibit 16 pg. 2 ¶ 6).[24]

> [U]nder Alabama law, "when an insurer denies coverage based on an exclusionary clause it bears the burden of proving the applicability of that exclusion." Jordan v. National Acc. Ins. Underwriters Inc., 922 F.2d 732, 735 (11th Cir.1991).
>
> A review of the Alabama cases and decisions of this Court shows that considerable latitude must be allowed the jury in determining the question of causation. An insurer cannot escape liability simply by showing that some disease may have contributed to some extent to the insured's death.
>
> Union Central Life Ins. Co. v. Scott, 286 Ala. 10, 236 So. 2d 328 (1970).

Tate v. Government Employees Ins. Co., 997 F.2d 1433, 1439 (11th Cir. 1993).

> In Union Central Life Ins. Co. v. Scott the Alabama Court spells out its reasoning:
>
> A review of the Alabama cases and the decisions of this Court show that considerable latitude must be allowed the jury in determining the question of causation. An insurer cannot escape liability simply by showing that some disease may have contributed to some extent to the insured's death. Most elderly people have some ailment, some latent disease. When an old person is injured, almost invariably an ailment is aggravated, a dormant disease is activated, and the effects of the injury intensified because of general frailty and lack of resistance to illness. Progressive weakness and increasing complications follow any time an old person is put to bed for any length of time. In every case therefore it is difficult to separate the effects of the accident from the effects of disease. The insurer would have us hold that there can be no recovery unless Death is present at the scene of the accident, or openly waits in continuous attendance on an injured insured from the moment of injury to the moment of death. Alabama courts, and this Court, take a more reasonable view.

---

[23] Exhibit 15: Letter from Dr. Barrington to AIG 3/2/2005
[24] Exhibit 16: Affidavit of Dr. Daniel W. Michael

Union Central Life Ins. Co. v. Scott, 286 Ala. 10, 12-14; 236 So. 2d 328 (Ala. 1970). The same reasoning applies in Godwin's case. Thus Godwin's breach of contract claim for the injury to his hip should proceed to a jury.

## II.   GODWINS BAD FAITH CLAIM DOES NOT FAIL AS A MATTER OF LAW

The Plaintiff does not dispute the elements of a bad faith claim as set out by the defendants in their brief and therefore will not reiterate them here.

### HERNIA

Godwin disputes that there was no breach of his insurance contract in this case. NUFI denied Godwin's occupational hernia claim stating that the reason for denial was "Not under dispatch nor was it loaded" (Exhibit 17 ¶ 1).[25] As explained above, Godwin was under dispatch as the term is defined in the policy. The policy does not require a truck to be "loaded" because when a truck driver has delivered a load he must then pick one up. Such is the nature of truck driving and it would be ludicrous to believe that the only time the insurance policy covered Mr. Godwin was when his truck was loaded. The Commission Reports which were submitted to NUFI substantiate that Godwin was in fact making deliveries on the day in question. (Exhibit 2 and 5). NUFI was aware that Godwin was under dispatch. An e-mail from Suzanne Adger (Palomar Agent) to Patricia Gambino (NUFI Agent) verifies that they knew Godwin had been working on the date of the accident. It states: "Pat, I have attached a letter from Godwin, as well as the earnings that were sent in that show he did work on 11-22-03 which is also the date of his injury." (Exhibit 19).[26] Although, NUFI paid on Godwin's hernia claim, they paid on the claim as "non-occupational" which relieved them of the obligation to pay disability benefits of $500.00 per week. Even with proof that Godwin was delivering loads on the day of his injury, NUFI denied his disability claim.

---

[25] Exhibit 17: Letter of Denial 2/27/2004
[26] Exhibit 19: E-mail Correspondence

NUFI had no good reason to deny Godwin's claim as "non-occupational." When NUFI had proof that he did work on the day in question, and they did not investigate any further before denying his claim. Had they taken the time to talk directly to Ollie Godwin they would have known that he was repairing a muffler in his shop between deliveries. If they had read the hernia rider they also would have discovered that "Any reference to an injury or accident as defined in the policy is hereby deemed to include Hernia. Benefits will be payable for a Covered Loss caused in whole or in part by, contributed to in whole or in part by, contributed to in whole or in part by, or resulting in whole or in part from, the Insured Person's Hernia. . ." The fact that Godwin's hernia resulted from two on the job injuries does make a difference because it resulted or contributed "in whole or in part" to the hernia. If either accident caused the hernia, the one where he was pulling the tarp over the load or the one where he was repairing the muffler, contributed to the hernia the claim should have been covered. (Exhibit 19). [27]It can be inferred that NUFI was looking for ways to deny coverage.

### HIP

NUFI denied Godwin's claim for injury to his hip because he did not meet the definition of injury under the policy. Specifically they stated that the injury must have resulted "directly from and independent of all other causes." NUFI went on to explain that they had spoken with Dr. Barrington directly and he stated "your condition was an underlying condition that was aggravated by work. He states that you had this condition but were not aware of it."

NUFI knew or should have known that Alabama law would not relieve them of the duty to pay Godwin's claim simply because it was discovered that a latent disease was present prior to the injury. Especially when Godwin's doctor had stated that the condition was aggravated by work and the "injury probably caused him to collapse it and therefore have the pain that resulted in his need for the hip replacement surgery." (Exhibit 15).

---

[27] Exhibit 19: Letter from Jerry Godwin to NUFI.

15

In bad faith cases the plaintiff must ultimately "show that the insurance company had no legal or factual defense to the insurance claim. The debatable reason means an arguable reason, one that is open to dispute. <u>Old Southern Life Ins. Co. v. Spann</u>, 472 So. 2d 987 (Ala. 1985). In this case, as discussed above, NUFI did not have a disputable legal reason to deny Godwin's claim simply because Godwin was found to have a disease. Under Alabama law that is not enough. They would be required to investigate further and examine whether the accident caused the chain of events which ultimately caused Godwin's hip to collapse.

NUFI denied some of Godwin's claims related to his accident on October 27, 2004, but paid $2,193.02 worth claims on the same accident. (Exhibit 21 and 13). This shows that NUFI, at some point, believed the claim was covered by the policy.

The evidence submitted by Godwin, when considered in the light most favorable to him, shows that NUFI denied his claim because of the underlying disease even though they were aware that the accident had aggravated the underlying disease and possibly caused his hip to collapse. Therefore they are not entitled to a judgment as a matter of law.

## CONCLUSION

Godwin has produced credible evidence that he was under dispatch when he was injured in 2003 and had a hernia surgically repaired. Godwin has also shown that there was no arguable reason to deny his hernia claim because information was provided to the insurer showing that Godwin was in fact working on the days he was injured.

Godwin has produced credible evidence that his hip injury aggravated an underlying disease that he did not know he had. The injury set into motion a chain of events that led to a collapse of his hip and surgical repair. The language in the policy does not exclude accidental injuries worsened by disease. To find that a person has to be disease free or taken into emergency surgery when they have an accident would be an unfair interpretation of the language of the policy. Under Alabama law the exclusionary

clause "directly and independently of all other causes" is not interpreted so strictly that it excludes an injury aggravated by a disease.

For these and all of the foregoing reasons, Defendants Motion for Summary Judgment is due to be denied.

Respectfully Submitted this the 27th day of October, 2006.

s/Arlene M. Richardson

Bar Number ASB 9452-I60A
Attorney for the Plaintiff
**Richardson Legal Center, L.L.C.**
P.O. Box 971
Hayneville, Alabama 36040
Telephone: (334) 548-5660
Fax: (334) 548-5661
E-mail: arlawyer@htcnet.net

## CERTIFICATE OF SERVICE

I hereby certify that on October 27 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Michelle L. Crunk        mlc@ffdlaw.com
John W. Dodson           jwd@ffdlaw.com, amj@ffdlaw.com

And certify that I have hereby mailed by United States Postal Service the document to the following non-CM/ECF participants:

   NONE
Respectfully submitted,

s/Arlene M. Richardson

Bar Number ASB 9452-I60A
Attorney for the Plaintiff
**Richardson Legal Center, L.L.C.**
P.O. Box 971
Hayneville, Alabama 36040
Telephone: (334) 548-5660
Fax: (334) 548-5661
E-mail: arlawyer@htcnet.net